BASSETT, J.
Following a jury trial in Superior Court (McHugh, J.), the defendant, Timothy McKenna; was convicted of six counts of aggravated felonious sexual assault. RSA 632-A:2 (2007). Prior to trial, the defendant moved to suppress his statements to the police on the ground that he was subject to a custodial interrogation without being informed of his Miranda rights. See Miranda v. Arizona, 384 U.S. 436 (1966). After an evidentiary hearing, the Superior Court (Delker, J.) denied the motion. The defendant appeals the trial court’s denial of his motion to suppress. We reverse and remand.
*674 The following facts are drawn from the trial court’s order or from uncontroverted testimony at the pretrial suppression hearing. In October 2010, the Newmarket Police Department received a report that K.L. had been sexually abused by the defendant approximately nine to fourteen years earlier. Lieutenant Kyle True and Sergeant Tara Laurent investigated the allegations and obtained a warrant for the defendant’s arrest. On October 22, 2010, True and Laurent, accompanied by New Hampshire State Trooper Relia, drove in two vehicles — one fully-marked State Police cruiser and one unmarked Ford Expedition — to a campground and restaurant owned by the defendant in Errol. The restaurant is located at the end of a one-eighth mile driveway and is not visible from the road. The driveway ends in a large clearing, surrounded by woods, which includes a one-acre field where the parking lot and restaurant are located.
Relia, dressed in his State Police uniform and armed with his service weapon, sought out the defendant to request that he speak to the officers. The Newmarket officers waited outside the restaurant. They wore jackets with the Newmarket police badge and their names embroidered on the front. Although both Newmarket officers were also armed, their jackets covered their weapons. The officers had an arrest warrant in their possession, and it was their intention to arrest the defendant that day, unless the defendant provided the officers information that established that he could not have committed the crime — for example, if the defendant had evidence that he had been outside of the country during the alleged incidents. True testified that he was looking to elicit a confession from the defendant.
Relia and the defendant met with the two officers. True then asked the defendant to speak with him and Laurent without either the defendant’s girlfriend or Relia present. True explained that the subject that they intended to discuss was private. He suggested that they sit in the unmarked Ford Expedition because the outside temperature was thirty-five degrees and the officers were not dressed for the outdoors. Laurent testified that the defendant was hesitant, and asked whether they could walk and talk instead. The officers agreed, and the two officers and the defendant began walking. Laurent testified that Relia and the defendant’s girlfriend walked in the opposite direction. Relia then returned to his cruiser, which he had parked in a location from which he was able to watch the defendant, True, and Laurent as they walked in the clearing.
The officers began by informing the defendant that they were there to “discuss [him] molesting [K.L.].” The defendant responded by saying that he “did not remember that.” Laurent then pulled out a picture of K.L. and showed it to the defendant. The defendant said he remembered her and that she was a “cute girl.” Laurent told the defendant that he was not under *675 arrest, and that the officers had come to see him because they wanted to get his side of the story. Laurent noticed that the defendant began to shake when the officers said that they were from Newmarket, and that as they spoke, he looked very nervous and was shaking even harder, so she asked him whether he was cold. The defendant responded that he was not cold, as he had just been working. The interrogation continued.
For approximately one hour and fifteen minutes, the defendant walked to different parts of the clearing, and the officers followed him. They did not allow the defendant to leave Rella’s line of sight. At one point, when the defendant began to walk into the woods, True said: “Hold it 'Em, we’re not walking out there. I don’t want to leave the sight of the trooper.” Although the defendant did not verbally respond, he stopped walking into the woods and changed direction. The officers continued to follow the defendant and ask questions. When the defendant walked to his truck to get more cigarettes, the officers again followed him. While he sat in the driver’s seat of the truck with his feet hanging out of the open door, the officers stood outside the vehicle and continued the questioning.
The two officers and the defendant spoke in a conversational tone. The defendant never unequivocally denied molesting K.L.; however, he denied having an “inappropriate relationship” with her, and repeatedly told the officers that he did not remember molesting K.L. The defendant often responded to the officers with questions of his own about the investigation. On multiple occasions during the interrogation, the officers told the defendant that they did not believe him, urging him to tell the truth. Many of the questions asked by the officers were premised upon the assumption that the defendant was guilty. The officers also posited numerous reasons as to why the defendant might have committed the crime — that he was emotionally attached to K.L., that he was sexually attracted to her, or that he wanted to hurt her. The defendant continued to shake as the interrogation continued. He was chain smoking, and at one point his breathing became shallow.
There is no evidence in the record that before or during the interrogation the defendant was told that he was free to leave the property or informed of his Miranda rights. Nor is there evidence that the officers informed him that he was free to ask them to leave the property, or that he was not required to answer their questions.
After approximately one hour of questioning, Laurent asked whether the defendant had had an emotional relationship with K.L. The defendant denied it. True then said, ‘You just wanted to come.” The defendant nodded his head and responded, ‘Yes, that was probably it.” True then asked if the defendant had had oral sex with K.L. The defendant responded, ‘Yes.” He thereafter made additional incriminating statements. After the defendant *676 made these admissions, the police accompanied him into the restaurant, where he spoke to his girlfriend. Shortly thereafter, he was arrested.
Prior to trial, the defendant moved to suppress his statements, arguing that the officers violated his rights under both the New Hampshire and United States Constitutions by subjecting him to a custodial interrogation without informing him of his Miranda rights. Following an evidentiary hearing during which the only witnesses were the two Newmarket officers, the trial court denied the defendant’s motion. The court concluded that the defendant was not in custody as he “was familiar with his surroundings, there were only two officers present, and the defendant was not physically restrained.” The court stated that the “type of freedom afforded the defendant during the interview bears none of the hallmarks of a formal arrest.” After a three-day jury trial, the defendant was convicted of six counts of aggravated felonious sexual assault. This appeal followed.
On appeal, the defendant argues that his rights under Part I, Article 15 of the New Hampshire Constitution and the Fifth and Sixth Amendments to the United States Constitution were violated. Specifically, he contends that the trial court erred in not suppressing his statements because, given that a reasonable person in his position would have believed himself to be in custody, the police should have advised him of his rights under Miranda.
We first address the defendant’s claim under the State Constitution and rely upon federal law only to aid in our analysis. State v. Ball, 124 N.H. 226, 231-83 (1983). Before the defendant’s responses made during a custodial interrogation may be used as evidence against him, the “State must prove, beyond a reasonable doubt, that it did not violate [his] constitutional rights under Miranda.” State v. Gribble, 165 N.H. 1, 10 (2013); cf. State v. Rathbun, 132 N.H. 28, 30 (1989) (ruling State’s burden to demonstrate defendant’s statement was spontaneous, and thus outside Miranda’s ambit, subject to preponderance standard). Compare State v. Lantagne, 165 N.H. 774, 776-77 (2013) (explaining State bears burden on motion to suppress), with, e.g., United States v. Davis, 792 F.2d 1299, 1309 (5th Cir. 1986) (stating that the defendant “had the burden of proving that he was under arrest or in custody”). Here, it is undisputed that the defendant was interrogated, and that he did not receive Miranda warnings; accordingly, the sole issue before us is whether that interrogation was custodial.
“Custody entitling a defendant to Miranda protections requires formal arrest or restraint on freedom of movement of the degree associated with formal arrest.” State v. Jennings, 155 N.H. 768, 772 (2007) (quotation omitted). “In the absence of formal arrest, we must determine whether a suspect’s freedom of movement was sufficiently curtailed by considering *677 how a reasonable person in the suspect’s position would have understood the situation.” Id. “The location of questioning is not, by itself, determinative: a defendant may be in custody in his own home but not in custody at a police station.” Id. (quotation omitted). “To determine whether a reasonable person in the defendant’s position would believe himself in custody, the trial court should consider the totality of the circumstances of the encounter,” id. (quotation omitted), “including, but not limited to, factors such as the number of officers present, the degree to which the suspect was physically restrained, the interview’s duration and character, and the suspect’s familiarity with his surroundings.” Id. at 773.
For purposes of appellate review, the trial court’s findings of historical facts relevant to the question of custody, that is, its determinations of “what happened,” are entitled to the deference we normally accord its factual findings. State v. Ford, 144 N.H. 57, 62 (1999) (quotation omitted). Because the ultimate determination of custody requires an application of a legal standard to historical facts, it is not merely a factual question but a mixed question of law and fact. Id. In a custody analysis, “the crucial question entails an evaluation made after determination of the historical facts: if encountered by a ‘reasonable person,’ would the identified circumstances add up to custody as defined in Miranda? Id. at 63 (quoting Thompson v Keohane, 516 U.S. 99, 113 (1995)) (brackets omitted). The trier of fact is not in an appreciably better position than we are to answer that question. Id. Therefore, although we will not overturn the factual findings unless they are contrary to the manifest weight of the evidence, we review the ultimate determination of custody de novo. Id.
Here, the trial court’s findings of historical facts relating to custody are not in dispute: the material facts are based upon the uncontroverted testimony of the two Newmarket officers. Moreover, neither party challenges the trial court’s underlying factual findings. Accordingly, in our custody analysis we accept and rely upon the historical facts as set forth in the suppression order.
We begin by observing that our analysis of whether a defendant was in custody during police interrogation is rarely based upon a static set of circumstances. Interrogations are fluid: What may begin as noncustodial questioning may evolve over time into custodial questioning. See, e.g., State v. Dedrick, 132 N.H. 218, 225 (1989), abrogated on other grounds by Ford, 144 N.H. at 62-63 and State v. Spencer, 149 N.H. 622, 625 (2003).
A number of factors must be balanced in determining whether, and at what point, a defendant was in custody during police interrogation. See, e.g., Jennings, 155 N.H. at 772, 773. Here, we first examine the degree to which *678 the officers restrained the defendant’s movement. As we observed in Jennings, the lack of handcuffs or similar devices is not dispositive, see id. at 773; indeed, effective restrictions on a defendant’s movement can be a product of verbal, psychological, or situational restraint. See United States v. Beraun-Panez, 812 F.2d 578, 580 (9th Cir.) (“Although not physically bound, [the suspect] was subjected to psychological restraints just as binding.”), modified, 830 F.2d 127 (1987). This is so because the “likely effect on a suspect of being placed under guard during questioning, or told to remain in the sight of interrogating officials, is to associate these restraints with a formal arrest.” United States v. Griffin, 922 F.2d 1343, 1350-51 (8th Cir. 1990); see id. at 1354 (finding defendant’s freedom restrained to degree associated with formal arrest because “he was accompanied by an officer when he retrieved cigarettes from other rooms in [his home] and was told to remain in view of the agents at all times”); cf. United States v. Hughes, 640 F.3d 428, 436 (1st Cir. 2011) (finding no custody when officers escorted defendant outside to smoke a cigarette, but did not limit his movement, and “defendant was not unduly intimidated by the interrogating officers,” as shown by his pausing during cigarette break).
In United States v. Mittel-Carey, the First Circuit Court of Appeals concluded that the level of control that the officers exercised over the defendant during the interrogation conducted at the defendant’s home carried the most weight in its custody analysis — officers ordered the defendant to dress and go downstairs, told him where to sit, and followed the defendant on the three occasions that he was permitted to move within his home. United States v. Mittel-Carey, 493 F.3d 36, 40 (1st Cir. 2007). The court explained that this factor weighed heavily in favor of custody, despite the defendant’s familiarity with the surroundings. Id. Here, similarly, the officers accompanied the defendant wherever he walked around his property. True agreed that, from the moment that the officers first spoke with the defendant, True knew that he was not going to allow the defendant to leave his sight. Although True did not verbally disclose his intent to the defendant, his actions — following the defendant everywhere he walked, including when he went to his truck to get more cigarettes — would have conveyed to a reasonable person the reality that the officers did not intend to allow the defendant to leave their sight. See Stansbury v. California, 511 U.S. 318, 325 (1994) (“An officer’s knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned.”).
Moreover, the officers also intervened to prevent the defendant from freely moving about his property. When he began walking into the woods, True said, “Hold it Tim, we’re not walking out there. I don’t want to leave *679 the sight of the trooper.” Throughout the interrogation, the officers and the defendant stayed within forty to fifty yards of Relia, and the defendant was aware of Rella’s presence. Although the defendant was generally determining the direction of the perambulation, as the trial court found, “the officers did not allow the defendant to enter the woods, or leave Trooper Rella’s line-of-sight.”
True’s testimony that the reason that the defendant was told not to enter the woods was officer safety does not impact our analysis: “[I]t is often the case that suspects are escorted or chaperoned during questioning for reasons unrelated to custody,” including for safety reasons, but “the relevant inquiry is the effect on the suspect.” Griffin, 922 F.2d at 1350 (quotation omitted). Compare id. at 1354, with United States v. Lifshitz, No. 03 Cr. 572 (LAP), 2004 U.S. Dist. LEXIS 18571, at *21-22 (S.D.N.Y. Sept. 15, 2004) (finding no custody despite restrictions on defendant because agent specifically explained to defendant that restrictions were for safety reasons). In Griffin, the court noted that, although the officers may have escorted the defendant from room to room for safety reasons, that purpose was not disclosed to the defendant, and, therefore, did not influence the analysis. Griffin, 922 F.2d at 1354. Similarly, here, although the officers may have had safety concerns, because those concerns were never communicated to the defendant, they do not influence our analysis of custody.
Custody for Miranda purposes can arise because of a formal arrest or the functional equivalent of arrest; accordingly, the fact that a suspect is not “under arrest” does not preclude a finding of custody. See, e.g., Jennings, 155 N.H. at 772, 775-76 (defendant was in custody despite not being under arrest). Nor is a statement to a suspect that he is not under arrest sufficient, by itself, to establish a lack of custody. Although such a statement generally weighs in favor of a finding of non-custody, see, e.g., United States v. Salvo, 133 F.3d 943, 951 (6th Cir. 1998), it is not dispositive; rather it is but one factor to be weighed in the custody analysis.
Given that informing the defendant that he is not under arrest does not end the custody inquiry, we also consider the fact that there is no evidence that the defendant was informed that he was free to terminate the interrogation. See United States v. Colonna, 511 F.3d 431, 435-36 (4th Cir. 2007) (finding that although the defendant was told that he “was not under arrest,” which weighed in favor of a conclusion of no custody, the defendant was in custody, in part because he “was never told that he was free to leave or that he did not have to respond to questions”); see also United States v. Griffin, 7 F.3d 1512, 1518 (10th Cir. 1993) (“[T]he extent to which the *680 suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will often defines the custodial setting.... Conversely, the lack of a police advisement that the suspect is at liberty to decline to answer questions or free to leave is a significant indication of a custodial detention.” (citations omitted)). Indeed, our cases reflect that we have consistently regarded as a significant factor in our custody analysis whether a suspect is informed that he or she is at liberty to terminate the interrogation. See State v. Locke, 149 N.H. 1, 7 (2002) (“Given the repeated advice that he was free to leave, we conclude that a reasonable person in the defendant’s position would not believe that he was restrained to the degree associated with formal arrest.”); State v. Hammond, 144 N.H. 401, 404 (1999) (finding no custody, based, in part, upon fact that officers informed the defendant several times that he was not under arrest and that he was free to leave at any time); State v. Johnson, 140 N.H. 573, 578 (1995) (finding no custody, in part, based upon fact that trooper informed defendant he was free to leave).
Here, the question is whether the restraint on the defendant’s movement was akin to a formal arrest. Consequently, whether the defendant was told that he was at liberty to terminate the interrogation provides strong evidence as to whether a reasonable person in the defendant’s position would feel free to leave. Thus, notwithstanding the fact that the defendant was told that he was not under arrest, the lack of evidence that he was told he was free to terminate the interrogation supports a finding of custody at some point during the interrogation.
The State relies upon State v. Turmel, 150 N.H. 377 (2003), arguing as follows: In Turmel we found no custody despite concluding that the defendant’s movements had been curtailed; in this case, because the defendant’s movements were never curtailed, a fortiori, he was not in custody. We disagree.
In Turmel, we distinguished an investigatory traffic stop, during which the police may temporarily seize a suspect for a period no longer than is necessary to confirm or dispel an officer’s suspicions of criminal conduct, from the “restraint on freedom of movement of the degree associated with formal arrest” that entitles a suspect to Miranda warnings. Turmel, 150 N.H. at 382-83. We cited Berkemer v. McCarty, 468 U.S. 420 (1984), and observed that during an investigatory traffic stop, a suspect may be temporarily in custody and not free to leave, yet Miranda warnings are not required. Id. at 383. In Berkemer, the Supreme Court explained that temporary custody during an investigatory traffic stop does not require Miranda warnings because the detention of a motorist is presumptively temporary and brief and is typically public. Berkemer, 468 U.S. at 437-38. In Turmel, the defendant was “not detained for an unduly long period of *681 time” and was “being held within the confines of a valid investigatory stop.” Turmel, 150 N.H. at 385. We concluded that, at the time that the defendant made the incriminating statement, “immediately after he got out of his car,” id., the stop had not “ ‘metamorphosed’ into the functional equivalent of arrest for Miranda purposes.” Id. at 384-85.
Here, the nature of the defendant’s interrogation was qualitatively different from questioning during an investigatory traffic stop; accordingly, the cases relating to traffic stops and allowing temporary custody without Miranda warnings are of .limited application. We observe that from the outset of the encounter in this ease, the circumstances differed significantly from a typical traffic stop: the officers told the defendant that they had traveled from Newmarket — approximately three hours away by car — to speak to him about a “private” matter. Cf. Berkemer, 468 U.S. at 437 (detained motorist’s expectation of interview limited in both time and potential penalty). For more than one hour the defendant was questioned about events that had occurred nine to fourteen years earlier. Unlike in Turmel, where “[t]he officers’ purpose was to confirm or dispel the suspicion that the defendant possessed marijuana,” Turmel, 150 N.H. at 384, here, the officers were, as True acknowledged, “looking to extract a confession.” Cf id. at 383 (explaining that scope of an investigatory stop “must be carefully tailored to its underlying justification — to confirm or to dispel the officer’s particular suspicion”). In short, the circumstances in this case are distinguishable from an investigatory traffic stop. Accordingly, the restraints that the officers placed on the defendant’s movement, at least from the point at which the officers did not allow the defendant to enter the woods or leave Rella’s line of sight, are a significant factor weighing in favor of an ultimate finding of custody.
We next turn to the character of the interrogation. See Jennings, 155 N.H. at 775 (nature of interrogation is important factor in custody determination). In our analysis, we consider the presence or absence of both accusatory questions and accusatory statements made during questioning. The accusatory nature of questioning is widely recognized as a factor weighing in favor of a finding of police custody. See, e.g., People v. Henry, 980 N.Y.S.2d 594, 596 (App. Div. 2014) (explaining that a factor in custody determination is “whether the questioning was accusatory or investigatory” (quotation omitted)); see also White v. United States, 68 A.3d 271, 281 (D.C. 2013) (“Questions that are inquisitorial in nature are likely to make an encounter with police more coercive.”); State v. Dailey, 273 S.W.3d 94, 103 (Tenn. 2009) (weighing in favor of custody that “[t]he character of the questioning was accusatory and demanding, aimed at convincing the Defendant that the police already had sufficient evidence to convict him of *682 murdering the victim and that he had to give them an explanation”). Accusatory questioning often conveys an officer’s belief in the defendant’s guilt and the officer’s intent to arrest. See United States v. Wauneka, 770 F.2d 1434, 1439 (9th Cir. 1985) (concluding defendant was in custody when, inter alia, questioning continued for over an hour and turned accusatory); Ross v. State, 45 So. 3d 403, 415-16 (Fla. 2010) (finding questioning “highly confrontational and accusatorial,” and weighing in favor of custody fact that “[t]he detective repeatedly told Ross that he knew Ross committed the crime and the only question remaining was why”).
Consistent with this widely accepted approach, we have repeatedly recognized the importance of the absence or presence of accusatory questioning in our analysis of custody, contrasting accusatory questioning, which weighs in favor of custody, with questioning of a purely general nature, which supports a determination of no custody. See State v. Steimel, 155 N.H. 141, 146 (2007) (observing that officer’s confronting defendant with suspicions constituted a “relevant factor,” but concluding no custody because confrontation “occurred near the end of an otherwise general and casual conversation”); cf. State v. Graca, 142 N.H. 670, 671, 675 (1998) (concluding no custody, in part, when questioning was of a “purely general nature,” concerning defendant’s identity and reason for being in park); State v. Green, 133 N.H. 249, 258 (1990) (finding no custody, in part because police did not accuse defendant of involvement in crimes for which he was later charged); State v. Tucker, 131 N.H. 526, 529 (1989) (finding no custody, in part, when officer questioned defendant in connection with general investigation of airplane accident and defendant was not focus of investigation). In State v. Dedrick, we upheld the trial court’s determination of custody after it “discerned a sea change in the tenor and character of Dedrick’s interview,” which “would have signaled [to] a reasonable man in the same circumstances that the freedom officers had accorded him earlier was no longer available and that, as often as he made denials, they would renew their accusations until, in the end, he either confessed or asked, as Dedrick in fact did, to speak with an attorney.” Dedrick, 132 N.H. at 225. That “sea change” stemmed from the officers’ questioning: Where the defendant had previously been “answering general questions about his background and activities,” the shift occurred when he was “accused of untruths and confronted with damning information,” and, “despite his vehement denials,” the officers insisted that he had committed the crime. Id.
Here, as in the latter stages of the Dedrick interrogation, the officers employed accusatory questioning. True acknowledged that the purpose of the questioning was to “extract a confession.” The officers agreed at the suppression hearing that their questions were premised upon the assump *683 tion that the defendant had committed the crime. On numerous occasions throughout the interrogation the officers asked the defendant why he had sexually abused K.L. and posited reasons for his actions. They asked the defendant if he had a sexual relationship with or molested another child at daycare. Moreover, we find significant that both officers agreed that, during an encounter lasting more than one hour, “the subject matter stayed the same,” and “there really wasn’t any other conversation, other than regarding [K.L.].” Thus, the accusatory nature of the questioning of the defendant is a significant factor weighing in favor of a finding of custody.
Likewise, accusatory statements made by the officers and directed at the defendant also weigh in favor of custody. See Jennings, 155 N.H. at 774 (weighing in favor of custody that officers repeatedly confronted defendant with their belief that victim was telling truth); Dedrick, 132 N.H. at 225 (weighing in favor of custody that defendant was accused of untruths and confronted with damning information). Although “Miranda warnings are not required simply because the person being questioned is one whom the police suspect,” Tucker, 131 N.H. at 529 (quotations omitted), the officers’ subjective beliefs as to the defendant’s guilt “may become relevant when they are communicated to the defendant and affect an objective determination of whether the defendant would feel free to leave.” State v. Muntean, 12 A.3d 518, 528 (Vt. 2010). Thus, confronting the defendant with evidence of guilt weighs in favor of custody: “A reasonable person would not feel at liberty to terminate a police interview after being confronted with such evidence, as a reasonable person understands that the police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime.” Id. (quotation omitted); see also Ross, 45 So. 3d at 416-17 (factor that weighed in favor of finding of custody was that defendant was confronted with strong evidence of his guilt); Aguilera-Tovar v. State, 57 A.3d 1084, 1092 (Md. Ct. Spec. App. 2012) (“When a suspect is made aware of the fact... that he is a suspect in a case and is not merely being questioned as a witness, that... weighs in favor of a finding of custody.”); Com. v. Groome, 755 N.E.2d 1224, 1234 (Mass. 2001) (a factor in custody analysis is whether officers have conveyed to person being questioned any belief or opinion that that person is a suspect).
In Jennings, the police officers repeatedly confronted the defendant with his daughter’s allegations of sexual assault, telling him that they were certain that the allegations were true. Jennings, 155 N.H. at 774. In concluding that the defendant was in custody, we explained that the control that the police exercised, when combined with the “clear indication that the police believed the defendant to be guilty of sexual assault[,] would have *684 signaled to a reasonable person that his freedom of movement was curtailed to the degree associated with formal arrest.” Id.
Here, as in Jennings, the defendant was confronted almost immediately — and throughout the interrogation — with the officers’ express statements that they believed him to be guilty of sexual assault. See Dedrick, 132 N.H. at 225 (finding custody when, despite defendant’s vehement denials, officers stated time and again that it was defendant who committed the crime). For example, True testified that he began the interrogation by stating, ‘You know we’re here to discuss you molesting [K.L.],” after which Laurent showed the defendant a picture of K.L. and said, ‘Yeah, this is the girl we’re here to discuss you molesting.” The officers acknowledged that they had told the defendant “repeatedly, that [they] believed, [that he] had committed aggravated, felonious sexual assault against a child,” that they “knew everything . . . about his relationship with [K.L.],” that they knew that he did it and that they believed that it happened. Both officers told the defendant that they did not believe him, and Laurent testified that they admonished the defendant an estimated fifteen times to “tell the truth.” The officers’ repeated statements to the defendant that they believed that he was guilty weigh in favor of custody.
Our conclusion that the accusatory questioning and statements weigh in favor of custody is not inconsistent with the trial court’s findings that “the character of the encounter was not fueled by hostility or animus,” and that the officers were polite and did not raise their voices. See, e.g., Dailey, 273 S.W.3d at 103 (concluding defendant was in custody and that questioning was accusatory although the officers’ “tone of voice and general demeanor were conversational”). Neither the absence of hostility on the part of the officers, nor the polite tone of the interrogation, neutralizes the content or import of the accusatory questions and statements, nor diminishes the weight which we accord to them. In sum, we find that the accusatory questioning and accusatory statements employed by the interrogating police officers each independently weigh in favor of a finding of custody, and further, that concurrently they strongly support such a finding.
Also relevant to our assessment of the character of the interrogation is the fact that the police initiated the contact with the defendant. When “confrontation between the suspect and the criminal justice system is instigated at the direction of law enforcement authorities, rather than the suspect, custody is more likely to exist.” Griffin, 922 F.2d at 1351; see State v. Hieu Tran, 71 A.3d 1201, 1207 (Vt. 2012); cf. Hammond, 144 N.H. at 404 (finding relevant to no custody determination that defendant drove himself to police station and at end of questioning was allowed to go home); State v. Carroll, 138 N.H. 687, 696-97 (1994) (explaining relevant to no custody *685 finding that defendant requested interview, drove himself to the interview, and on prior day had requested and received permission to leave). Here, not only did the police initiate the contact, but the defendant was aware that the officers traveled from Newmarket to confront him, and they were accompanied by a State Trooper. We find that this factor also weighs in favor of a finding of custody.
We do not mean to suggest that all of the circumstances surrounding the interrogation decisively weigh in favor of a finding of custody; in fact, this is a close case. Some factors, standing alone, weigh against a finding of custody, or are at most neutral considerations. For example, as we discussed earlier, the fact that the defendant was told that he was not under arrest supports a finding of no custody. In regard to the number of officers involved, we agree with the State that, in isolation, the involvement of only two officers in the interrogation would weigh against custody. However, Rella’s presence in his marked cruiser during the interrogation contributed to a police-controlled atmosphere, and largely neutralizes this factor.
We recognize that a defendant’s familiarity with his surroundings, taken in isolation, often weighs against a finding of custody. See Hughes, 640 F.3d at 435-36. However, as we observed in Jennings, “[t]he location of questioning is not, by itself, determinative: a defendant may be in custody in his own home but not in custody at a police station.” Jennings, 155 N.H. at 772 (quotation omitted). We note that other courts have found an interrogation custodial notwithstanding the fact that -the defendant was questioned in familiar surroundings. See, e.g., Mittel-Carey, 493 F.3d at 40 (‘While an interrogation in a defendant’s residence, without more, certainly weighs against a finding of custody, ... the level of physical control the agents exercised over [the defendant] in this case weighs heavily in the opposite direction, despite the fact that the control was exercised inside defendant’s home.” (citation omitted)); Sprosty v. Buchler, 79 F.3d 635, 641 (7th Cir. 1996) (“More important than the familiarity of the surroundings where [the defendant] was being held is the degree to which the police dominated the scene.”). On balance, here this factor weighs slightly against a finding of custody.
Finally, we conclude that the length of the interrogation in this case, approximately one hour and fifteen minutes, weighs neither in favor of, nor against, a finding of custody. See, e.g., Mittel-Carey, 493 F.3d at 40 (length of interrogation of ninety minutes to two hours supported finding of custody); Jennings, 155 N.H. at 774 (“nearly two hours” of questioning supported conclusion of custody); State v. Goupil, 154 N.H. 208, 226 (2006) (finding no custody when interview lasted less than fifteen minutes); Locke, 149 N.H. at 6 (three and a half hours not excessive and no custody); State *686 v. Dorval, 144 N.H. 455, 456-57 (1999) (interview of three hours “relatively short” and no custody); Johnson, 140 N.H. at 578 (finding no custody, in part, when questioning lasted approximately ten minutes).
The determination as to whether the defendant is in custody for purposes of Miranda requires us to analyze the totality of the circumstances, and not to rely on any single factor in isolation. See Jennings, 155 N.H. at 772. “Custody should not be a mystical concept to any law enforcement agency. We see no reason why doubts as to the presence or absence of custody should not be resolved in favor of providing criminal suspects with the simple expedient of Miranda warnings.” Griffin, 922 F.2d at 1356. “Effective law enforcement is not frustrated when police inform suspects of their rights.” Id. “Such practices protect the integrity of the criminal justice system by assuring that convictions obtained by means of confessions do not violate fundamental constitutional principles.” Id.
After considering the “totality of the circumstances of the encounter,” Jennings, 155 N.H. at 772 (quotation omitted), and balancing all of the relevant factors, we hold that the defendant was in custody for the purposes of Miranda no later than when the officers prevented him from entering the woods. We conclude that, at least by that point, a reasonable person in the defendant’s position would have understood he was effectively under arrest. The officers had accompanied the defendant wherever he went on his property, and, when the defendant tried to enter the woods, True instructed him not to do so. Further, the officers did not allow the defendant to leave the sight of the State Trooper who was monitoring the interrogation from a marked cruiser. Although the defendant was informed that he was not under arrest, there is no evidence that the officers ever informed the defendant that he was free to terminate the interrogation. In addition, we accord substantial weight to the fact that the officers’ questions were accusatory and focused on the defendant’s alleged criminal activity. For more than an hour, through their use of accusatory statements and questions, the officers repeatedly conveyed their belief in the defendant’s guilt. Accordingly, pursuant to Part I, Article 15 of the New Hampshire Constitution, any incriminating statements made by the defendant after True’s instruction not to enter the woods must be suppressed.
At the same time, based on the record before us, we conclude that the defendant was not yet in custody for the purposes of Miranda at the beginning of the encounter. Accordingly, the defendant’s initial responses to the officers that he “did not remember that,” and that K.L. was a “cute girl,” need not be suppressed.
As to the interrogation that occurred between the defendant’s initial responses and True’s instruction to him not to enter the woods, the record *687 is unclear regarding the sequence of events — specifically, the interrelationship between the actions and questioning of the police and the statements made by the defendant. Thus, we are unable to determine as a matter of law that the interrogation was noncustodial prior to True’s instructions. Accordingly, we remand for the trial court to make specific findings and rulings regarding the admissibility of any incriminating statements made by the defendant after his initial responses, and before True’s instruction not to enter the woods.
“Because the defendant prevails under the State Constitution, we need not address his claim under the Federal Constitution.” Jennings, 155 N.H. at 776.

Reversed and remanded.

HICKS and CONBOY, JJ., concurred; Lynn, J., with whom DALIANIS, C. J., joined, dissented.