NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by email at the following address: reporter@courts.state.nh.us.  Opinions are available on the Internet by 9:00 a.m. on the morning of their release.  The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Hillsborough-southern judicial district
No. 2021-0394

STATE OF NEW HAMPSHIRE

v.

CALEB DOUGLAS MARQUIS

Argued: September 20, 2022
Opinion Issued: May 4, 2023

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Elizabeth C. Woodcock, senior assistant attorney general, on the brief and orally), for the State.

Stephanie Hausman, deputy chief appellate defender, of Concord, on the brief and orally, for the defendant.

HANTZ MARCONI, J.  The State brings this appeal pursuant to RSA 606:10, II(a), arguing that the Superior Court (Colburn, J.) erred in suppressing statements made by the defendant, Caleb Douglas Marquis.  See RSA 606:10, II(a) (2001).  The trial court ruled that the defendant was subject to custodial interrogation at the time he gave the statements, and, because he was not given the warnings required by Miranda v. Arizona, 384 U.S. 436

(1966), those statements were obtained in violation of his right against self-incrimination.  We affirm in part, reverse in part, and remand.

## I.

The trial court found, or the record supports, the following facts.  In September 2020, Nashua emergency services responded to a call about an unconscious 16-month-old child who was hurt in the shower while under the defendant's care.  The toddler was the defendant's girlfriend's child.  Several uniformed officers arrived to secure the apartment "as a scene" and asked the defendant if he would go to the station for an interview.  The defendant asked if he was under arrest, and, after an officer told him that he was not, he agreed to an interview.  The defendant asked for a ride, and an officer drove him to the Nashua police station in the back of a cruiser.  He entered the station's lobby, signed in as a visitor, and was issued a visitor's badge.  Officers escorted the defendant to and from the interview room on the second floor of the station.

Two detectives questioned the defendant inside the interview room.  The interview was recorded.  The trial court, having viewed the recording, described the room as "a 10-foot-by-12-foot room with a square table pressed up against one wall and three chairs around the table.  The room has no windows and a single door. . . . [It] is not large enough to allow a person to exit it while the chairs are occupied."  The defendant sat in the chair farthest from the door, with the two detectives between him and the door.  The detectives wore "professional clothing," were not armed, and did not display badges.  There were three interviews in this setting.  The first two were held on the evening of September 15, shortly after the incident, and the third was held on the afternoon of September 16.  The detectives did not give the defendant Miranda warnings before any of the interviews.

The first interview began with Detective Durden asking the defendant, "You know you're here voluntarily, right? You're signed in as a visitor?"  The defendant answered, "Yeah."  Durden told the defendant he was free to leave or to stop talking, and began questioning him.  The defendant described showering the child, briefly leaving the bathroom to check on the dog, and returning to find the child unconscious.  The trial court found that the detectives' tone was "cordial" and "calming" throughout.  During a break, the defendant asked if he could use his cell phone, but Durden asked him to "hold off on that."  The defendant kept his cell phone and can be seen in the video using it anyway.  In all, the first interview lasted about 75 minutes.

The defendant remained in the interview room, and the second interview, also recorded, began about 15 minutes later.  The detectives again assured the defendant that he was a visitor and was free to "stop talking."  They informed the defendant that the child had suffered first- and second-degree burns and was being transferred to Massachusetts General Hospital.  The detectives

2

compared the defendant's story to reports from the hospital and began to ask about inconsistencies, though the trial court found that "the conversation remained cordial." The second interview lasted about 17 minutes.

The next day, Durden called the defendant and asked if he would come in for a third interview. The defendant agreed and got a ride to the station from a friend. He again signed in as a visitor and was escorted to the interview room where the interview was again recorded. Durden reminded the defendant that he was there voluntarily and was free to leave, and the defendant responded that he understood. Durden continued, "If at any point in time you feel uncomfortable and don't want to talk to me, you need more water, you need to go to the bathroom or anything like that just let me know and we'll be more than happy to accommodate that, ok?" The defendant answered affirmatively, and the interview began.

Durden began by telling the defendant, "[W]e have more questions. Obviously we're putting a case together." He explained that he had received a report from the hospital and believed "there's more to the story" than what the defendant had told him the day before. In response, the defendant volunteered that he had learned from his girlfriend that the doctors had found "a significant amount of THC . . . in the baby's system." He admitted that he smoked marijuana with his girlfriend the day of the incident and that they sometimes smoked around the children. But he expressed disbelief that marijuana had caused the child to pass out. Instead, he theorized that flushing the toilet caused the shower to overheat, causing the child to pass out. The detectives shifted the conversation back to marijuana:

> [Durden]: [The doctors] know for a fact there was a high level of THC in his blood. Ok? It didn't just get there from walking in a room where you smoked earlier in the day. That's, that's not how it works.
>
> [Defendant]: Right. So, like he must have got in weed then. . . .
>
> [Durden]: Well, here's my issue with that. He didn't ingest the weed because he had petechiae, which is the, like, blood vessels across all red right here, and that's from coughing, excessive coughing. He had large amounts of that around his chest and his neck and they said that's from him coughing.
>
> [Defendant]: Ok.
>
> [Durden]: So your story's not adding up right now. So that's why we're having this conversation, because there's a lot of unanswered questions and I have a theory what I think, and I'm fairly certain I

3

know what happened and your story is not jiving with that, so it looks like you're trying to be deceitful . . . .

The defendant denied giving the child marijuana and said that he felt like he was being looked at like a "baby killer" and a "monster." Durden told him:

> [W]e don't think you're a monster. . . . [B]ut the fact of the matter is, we have facts that the doctor's giving us, stuff that we can't deny, that's facts, that certain things lead to this. And your story of what happened is not, it doesn't, 1 and 1 is not equaling 2 right there. . . . [I]n Colorado there's kids that take THC all the time to get them to calm down. Is it something like that? Did you do that because that would explain it and then I could be like alright. He did that to get the kid to calm down and obviously it went a little too carried away, and then it shows that you're not lying. You're not being deceitful. . . . Or, if that's not the case, then, we've got a lot more digging to do . . . . [I]t looks like it could be a neglect case, like that you purposely tried hurting the kid.

The defendant denied intentionally getting the child high, but admitted that he had smoked a joint while bathing the child. Durden explained that second-hand smoke in a small bathroom could cause a child to become intoxicated, and the defendant agreed it was possible. Detective Miller then spoke for the first time:

> [Miller]: Be honest about what happened. That's where you're at right now. 'Cause we know that, like detective Durden was saying, the best specialists in the world . . . tell us that your story that you said yesterday is not accurate, ok?
>
> [Defendant]: [Begins to speak]
>
> [Miller]: Hold on. Hear me out. It's not accurate. 98% of the people that we see in this room are good quality people trying to do the right thing. . . . 2% that we see in this very room are monsters. Absolute trash, terrible, terrible people. . . . You don't look like a 2%. But when we have the, the most world renowned doctors in the world saying he's, he's, he's lying to you. He's not, he's not being truthful, right? That, that makes you look like that 2%, which is terrible. . . . We know what you said yesterday and what you're saying here today is not accurate.

For the next few minutes, the detectives pressed the defendant to "[j]ust tell the truth," and insisted his story was "not adding up."

4

As the conversation continued, the defendant described teaching the child to get used to showering.  He explained that he kept the child in the shower despite the child attempting to get out, but denied forcing the child under scalding water.

[Defendant]: I wouldn't be like alright, dude, stay in the red.

[Miller]: Caleb, Caleb.  We know that that's what happened.  Ok.  We know it wasn't a quick flush [of] the toilet and that's what happened.  I'm not saying you looked at him and said ha ha, look at this kid, he's burning and I'm gonna prove him a lesson.  I'm saying that I think that it got a little bit far . . . . You're trying to show, just give him tough love and show water's ok.

. . . .

[Miller]: And then after the fact, I think you realized, oh s**t.  It went a little too far. . . . I was trying to teach him a lesson and boy did I mess up.  Right?  That's the truth that happened here.  He knows it.  I know it.  All the doctors that looked at the young kid yesterday know it.

After a few more minutes, Durden said the following:

[Durden]: So you're 28 years old.  At what point do you stop lying to yourself?  Because . . . you told me two different stories just today alone on certain things you're forgetting things and you're telling me other parts of things the story that's just not making sense . . . . [A]t what point do you man up and say I screwed up.  You keep saying . . .

[Defendant]: [Begins to speak]

[Durden]: Stop.  Let me finish.  You keep saying, I wasn't thinking of it.  I wasn't thinking of it.  At what point do you just say, you know what, I'm gonna man up and I'm gonna own what I did and you're copping out.  You keep saying I wasn't thinking of it.

. . . .

[Durden]: So at what point do you man up and say you know what, I f**ked up?

The defendant responded that he had "f**ked up" and "wasn't fully paying attention."  Miller suggested to the defendant that he had been "[r]eckless," and

5

the defendant adopted that characterization of his actions. The interview soon ended, lasting about 90 minutes total. The defendant left the station following the interview.

The defendant was subsequently arrested and charged with several felonies relating to first- and second-degree burns the child received while under the defendant's care. He moved to suppress the statements he made during all three interviews. The trial court held a hearing and heard testimony from responding officers and Durden. The State submitted the video recordings and transcripts of the three interviews to the trial court. The court concluded that a reasonable person in the defendant's position would not have believed himself to be in custody during the first two interviews, and therefore denied the defendant's motion to suppress his statements made in those interviews. However, the court concluded that the defendant was in custody during the third interview and suppressed the defendant's statements from that interview. The State filed a motion to reconsider, to which the defendant objected. The court denied the State's motion, and this appeal followed.

II.

The State argues that the defendant was not in custody during the third interview, and therefore, he was not entitled to Miranda warnings. The defendant contends that the court's custody finding was proper. The parties cite both the New Hampshire Constitution and the United States Constitution in support of their arguments. See N.H. CONST. pt. I, art. 15; U.S. CONST. amends V, XIV. We first address the State's argument under the State Constitution and rely upon federal law only to aid our analysis. State v. Ball, 124 N.H. 226, 231-33 (1983).

Before a defendant's responses made during a custodial interrogation may be used as evidence against him, the State must prove, beyond a reasonable doubt, that it did not violate his constitutional rights under Miranda. State v. Carrier, 173 N.H. 189, 197 (2020). Two conditions must be met before Miranda warnings are required: (1) the suspect must be "in custody"; and (2) he must be subject to "interrogation." State v. Sachdev, 171 N.H. 539, 548 (2018). If a defendant is not subject to custodial interrogation, then Miranda warnings are not required. Carrier, 173 N.H. at 197. Because there is no dispute that the detectives interrogated the defendant, the only issue before us is whether the defendant was in custody during the third interview.

Custody entitling a defendant to Miranda protections requires formal arrest or restraint on freedom of movement to the degree associated with formal arrest. State v. McKenna, 166 N.H. 671, 676 (2014). In the absence of formal arrest, the court must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable person in

6

the suspect's position would have understood the situation. Id. at 676-77; see also Thompson v. Keohane, 516 U.S. 99, 112 (1995) ("[W]ould a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave[?]"). To determine whether a reasonable person in the suspect's position would believe himself to be in custody, the court considers the totality of the circumstances of the encounter, "including, but not limited to, factors such as the number of officers present, the degree to which the suspect was physically restrained, the interview's duration and character, and the suspect's familiarity with his surroundings." McKenna, 166 N.H. at 677 (quotation omitted).

When we conduct our appellate review, the trial court's findings of historical fact, that is, its determination of "what happened," are entitled to the deference we normally accord its factual findings. State v. Ford, 144 N.H. 57, 62 (1999). We will not overturn the trial court's factual findings unless they are contrary to the manifest weight of the evidence. McKenna, 166 N.H. at 677. Because the custody determination requires an application of a legal standard to historical facts, the ultimate custody determination is a mixed question of law and fact. Id. The crucial question is: "if encountered by a 'reasonable person,' would the identified circumstances add up to custody as defined in Miranda?" Carrier, 173 N.H. at 198 (quotation omitted). Accordingly, we review the ultimate custody determination de novo. Id.

In its order, the trial court found four factors that supported its custody finding: (1) the "nature of the questions was increasingly accusatory"; (2) the "conditions of the interview room" limited the defendant's freedom of movement; (3) the duration of the interview was about an hour and a half and it followed two interviews the previous night; and (4) the police requested the interview. The court acknowledged that other factors weighed against that finding: (1) the defendant entered the station through the lobby and signed in as a visitor; (2) the detectives wore plain clothes and were unarmed; (3) the defendant was clearly informed he could "terminate the conversation" and "stated that he was speaking with the detectives voluntarily"; (4) the defendant never asked to end the interview or leave; and (5) the defendant kept his cell phone. However, the trial court concluded that under the totality of the circumstances, a reasonable person would have believed himself to be in custody during the entire third interview.

The State argues that the questioning was not accusatory, that the trial court ignored "key facts" that weigh against a custody finding, and that the trial court improperly relied on the size of the interview room and the duration of the third interview. We address each argument in turn.

A. Accusatory Questioning

The State challenges the trial court's factual finding that the questioning was "increasingly accusatory." Accusatory questioning weighs in favor of a

7

finding of custody because it often conveys that the officer believes the suspect is guilty and that the officer intends to arrest. State v. Marin, 172 N.H. 154, 161 (2019). Similarly, confronting a suspect with evidence of guilt weighs in favor of a finding of custody because a reasonable person understands that the police ordinarily will not set free a suspect when there is evidence strongly suggesting that the person is guilty of a serious crime. McKenna, 166 N.H. at 683. In contrast, "questioning of a purely general nature" does not weigh in favor of a finding of custody. Id. at 682. Also relevant to the analysis of an interrogation's character is whether officers raised their voices or used harsh language. Carrier, 173 N.H. at 201.

We conclude that the trial court's finding that the questioning became accusatory is supported by the record. Durden began by telling the defendant, "Obviously we're putting a case together." Durden soon told the defendant, "So your story's not adding up right now. . . . I have a theory what I think, and I'm fairly certain I know what happened and [your] story is not jiving with that, so it looks like you're trying to be deceitful." The detectives told the defendant that doctors had told them that he was lying. Miller said that they knew the "truth" and that the defendant was "trying to teach [the child] a lesson." The accusatory tone culminated with Durden asking the defendant when he was going to "stop lying to [him]self," "man up," and admit that he had "f**ked up." Miller then prompted the defendant to admit he had been "reckless," a description which the defendant adopted. We agree with the trial court that these statements and questions "were premised upon the assumption that the defendant had committed the crime and would have communicated that assumption to a reasonable person in the defendant's position." Carrier, 173 N.H. at 202 (quotation omitted); see also McKenna, 166 N.H. at 682-84.

The State argues that the questioning here is distinguishable from the accusatory questioning in McKenna. We disagree. In McKenna, the defendant was confronted "with the officers' express statements that they believed him to be guilty of sexual assault." McKenna, 166 N.H. at 684. The officers told him that they "knew everything," and "knew that he did it." Id. The officers told the defendant that "they did not believe him" and "admonished the defendant an estimated fifteen times to 'tell the truth.'" Id. Here, the detectives told the defendant that they knew that he had been "trying to teach [the child] a lesson," and they insisted that he "man up" and admit that the injuries were his fault. The detectives repeatedly said that they did not believe the defendant's story and that they had the evidence to disprove it. Even though the detectives here did not accuse the defendant of a specific crime, as did the officers in McKenna, the underlying message was the same — the detectives believed that the defendant was criminally responsible for the child's injuries, and they would continue the interrogation until he admitted it.

In arguing that the questioning was not accusatory, the State asserts that the detectives did not "raise their voices" or "aggressively question the

defendant." But questioning need not be loud or aggressive to be accusatory. McKenna, 166 N.H. at 684 ("Neither the absence of hostility on the part of the officers, nor the polite tone of the interrogation, neutralizes the content or import of the accusatory questions and statements, nor diminishes the weight which we accord to them."). Nevertheless, whether the detectives raised their voices or aggressively questioned the defendant are relevant considerations. See Carrier, 173 N.H. at 201. The trial court found that Durden raised his voice when he stated, "So you're 28 years old. At what point do you stop lying to yourself?" Even if we agreed with the State that Durden did not raise his voice here, it was also during this exchange that Durden told the defendant to "man up" and to admit he had "f**ked up." These statements contradict the State's argument that the questioning was not aggressive. We conclude that the harsh language here further supports a custody finding, particularly in conjunction with the accusatory tone described above.

B. Disputed Factors that Weigh Against a Finding of Custody

The trial court acknowledged that several factors weigh against a finding of custody. The State argues that the court did not place enough weight on those factors, and that it ignored others. The State's brief emphasizes four factors.

First, the State argues that the detectives assured the defendant that he was a visitor and free to leave. See State v. Jennings, 155 N.H. 768, 775 (2007) ("A person who is clearly advised that he is free to leave is ordinarily not in custody."). While we, like the trial court, recognize that this factor weighs against a finding of custody, the weight of these assurances is largely neutralized by the accusatory tone of the interview. A reasonable person who learns that detectives believe the person to be guilty would not place significant weight on their earlier assurances that the person could leave. In Jennings, we similarly concluded that police assurances that the defendant was free to leave were outweighed by other indicia of custody, including "the accusatory nature of the interview." Jennings, 155 N.H. at 775-76. There, police "confronted the defendant with his daughter's allegations of sexual assault" and said that they were "certain she was telling the truth." Jennings, 155 N.H. at 774. We thus concluded that even if the police "informed the defendant that . . . he could leave at any time, it would be naive of the court to suggest that a reasonable person in the position of the defendant would have believed . . . he would be allowed to get up and leave." Id. at 775-76. Likewise, in Dedrick, we agreed with the trial court's conclusion that "[w]hen confronted with the inconsistencies by the detectives . . . [the defendant] certainly would be justified in concluding he was not then free to leave, even though the detectives assured him that he was not under arrest." State v. Dedrick, 132 N.H. 218, 223, 224-25 (1989) abrogated on other grounds by Ford, 144 N.H. at 62-63, and State v. Spencer, 149 N.H. 622, 625 (2003). As these cases demonstrate,

9

boilerplate assurances that a defendant is free to leave do not necessarily negate confrontational and accusatory questioning. This factor did not render the interview non-custodial.

Second, the State argues that the trial court should have considered the fact that "the defendant arrived at the police station on his own, without coercion." The fact that the defendant arranged for his own transportation to the station weighs against a finding of custody. See Sachdev, 171 N.H. at 553. We acknowledge this factor, but note that the defendant only went to the station at the request of the police. When police initiate contact with a defendant, this fact weighs in favor of a custody finding. See McKenna, 166 N.H. at 684-85. Moreover, a police request for an interview does not need to be coercive to weigh in favor of custody. See id. at 674, 684-85. (officer merely "ask[ing] the defendant to speak with him" weighed in favor of custody). Even without coercion, a reasonable person would have difficulty refusing a police request to talk. See State v. Jones, 172 N.H. 774, 777 (2020) ("[A]s a practical matter, citizens almost never feel free to end an encounter initiated by the police." (quotation omitted)). Thus, the fact that the defendant arranged for his own transportation to the station after police requested the interview is not an important factor in this case.

Third, the State asserts that the fact that only two detectives conducted the interview weighs against a custody finding. In isolation, the involvement of only two officers in an interrogation can weigh against custody. McKenna, 166 N.H. at 685. In McKenna, however, we reasoned that this factor was "neutralize[d]" by "a police-controlled atmosphere." Id. In that case, two officers interviewed the defendant in an open field outside his workplace, while a third officer sat nearby in his marked cruiser. McKenna, 166 N.H. at 674-75, 685. Here, the interview occurred inside a police station, an even more police-controlled atmosphere. And as described in the court's order, the presence of two detectives in the cramped interview room limited the defendant's ability to freely stand up and leave. Under these circumstances, the fact that only two detectives conducted the interview is not a significant factor that weighs against a custody finding.

And fourth, the State argues that the trial court "did not refer to [the recorded interviews] in gauging the defendant's behavior" or "consider the defendant's behavior while the detectives were out of the room," and contends that the defendant's behavior shows that he did not perceive himself to be in custody. As the State and the defendant both acknowledge, however, the custody analysis is an objective test focused upon how a reasonable person in the suspect's position would have understood the situation. State v. Steimel, 155 N.H. 141, 146 (2007); see also Stansbury v. California, 511 U.S. 318, 323 (1994) ("[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."); J.D.B. v.

10

<u>North Carolina</u>, 564 U.S. 261, 271 (2011) ("[T]he objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind."). Accordingly, the trial court did not err by omitting reference in its order to the defendant's behavior or his subjective perception of the situation.

C. <u>The Size of the Interview Room and the Duration of the Interviews</u>

The State argues that "the size of the interview room is not a factor that weighs in favor of custody." (Capitalization and bolding omitted.) The State asserts that in <u>State v. Belonga</u> we described an eight-by-ten-foot interview room as "not inordinately small." <u>State v. Belonga</u>, 163 N.H. 343, 355 (2012). While the ten-by-twelve-foot room here is larger, the trial court did not rely on the room's size alone. Rather, it reasoned that the "conditions of the interview room" restricted the defendant's freedom of movement. The conditions of an interview room, including its size, are a relevant custody consideration. <u>See</u> <u>Dedrick</u>, 132 N.H. at 221, 225 (upholding custody finding based, in part, upon the "nature of the room," where the interview room was windowless, measured "eight by eight feet," and two officers sat between the defendant and the door); <u>Sachdev</u>, 171 N.H. at 553 (acknowledging that interview "in a small interview room, with the door closed, and with the defendant in the chair furthest from the door" weighed in favor of a finding of custody). Here, the court found that the room was windowless, "barely large enough to fit all three individuals in their chairs around the table," that the defendant "sat in the chair furthest from the door," and that the defendant could not exit "unless Detective Durden stood up, pushed his chair under the table, and moved out of the way." And, importantly, this was an interview room in a police station. <u>See</u> <u>Sachdev</u>, 171 N.H. at 549 (fact that "questioning took place at the police station" weighed in favor of custody finding). We thus conclude that the setting of this interview supports the trial court's custody determination.

The State also argues that the duration of the third interview does not support the court's order because "[t]his Court has found similar lengths of time to be neither inordinate nor oppressive." We recognize that similar durations have supported custody findings in some cases, but not others. <u>See, e.g.</u>, <u>McKenna</u>, 166 N.H. at 685 (interrogation for "one hour and fifteen minutes" weighed neither for nor against a finding of custody); <u>State v. Locke</u>, 149 N.H. 1, 6 (2002) (three and one-half hours of questioning not excessive, no custody); <u>Jennings</u>, 155 N.H. at 774 ("nearly two hours" of questioning weighed in favor of custody). Nevertheless, when we consider the character of the interview in conjunction with the length of the interview, (<u>i.e.</u>, how long the defendant was subject to accusatory questioning), the duration weighs in favor of custody. <u>See</u> <u>Carrier</u>, 173 N.H. at 200 n.2 ("[T]he character of an interrogation may impact whether . . . duration is a reliable indicator of custody" and "is often a more reliable barometer for custody than its

11

duration."). Ultimately, we are less concerned with duration for its own sake than we are with what was said during that duration. Because this was an hour and a half of accusatory questioning, following over an hour and a half of questioning the night before, the duration supports the trial court's order.

III.

We recognize that here, "as in virtually every case, there are some factors that weigh in favor of a finding of custody, and some that weigh against such a finding." Marin, 172 N.H. at 160. Nevertheless, after considering the totality of the circumstances of the third interview, we conclude that a reasonable person in the defendant's position would have believed himself to be in custody during that interview. Thus, the trial court did not err when it found the defendant was in custody.

The State contends that the entire interview should not be suppressed because, even if it became accusatory, it was not accusatory from start to end. We agree that the first few minutes of the interview were not accusatory and should not be suppressed. Once Durden told the defendant "it looks like you're trying to be deceitful" and that "it potentially could be a criminal matter," the interview became sufficiently accusatory that a reasonable person would believe himself to be in custody, and all subsequent statements should be suppressed. Accordingly, we reverse the trial court's suppression order as to the statements made by the defendant prior to these two statements by Durden, but otherwise affirm the court's decision.

The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. Sachdev, 171 N.H. at 554. Therefore, we reach the same result under the Federal Constitution as we do under the State Constitution.

Affirmed in part; reversed<br>in part; and remanded.

MACDONALD, C.J., and HICKS, BASSETT, and DONOVAN, JJ., concurred.

12