10th Circuit Court — Salem Family Division
No. 2013-542

## IN RE B.C.

Argued: September 11, 2014
Opinion Issued: January 29, 2015

*Joseph A. Foster*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

B.C., for herself, filed no brief.

*David M. Rothstein*, deputy director, of Concord, on the brief and orally, for the New Hampshire Appellate Defender Program, as *amicus curiae*.

BASSETT, J. The State appeals an order of the Circuit Court (*Sullivan*, J.) granting the motion of the juvenile, B.C., to suppress a statement obtained in violation of her rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and *State v. Benoit*, 126 N.H. 6 (1985). We affirm.

## I. Factual Background

The trial court found, or the record establishes, the following facts. The juvenile, who was fourteen years of age at the time, was arrested for shoplifting merchandise from "Claire's," a discount jewelry store in the Rockingham Mall. She was transported, in handcuffs, to the Salem Police station. At the station, the handcuffs were removed, and the juvenile was taken to the booking room, which has a locked entry. The arresting officer telephoned the juvenile's mother to pick her up. While in the booking room, the juvenile asked if she could use the bathroom. An officer allowed her to use the bathroom in one of the holding cells. Another officer observed her via a closed circuit monitor in the supervisor's office. He saw the juvenile "just . . . flush the toilet" and believed that "[i]t looked like she had flushed something down the toilet." The officer, who had observed the juvenile, spoke with the arresting officer, and the arresting officer asked the juvenile "what she had flushed down the toilet." The juvenile told the arresting officer "that it was a necklace that she had taken and . . . had concealed in her pants." The officer did not inform the juvenile of her *Miranda* rights before questioning her or at any other time. The juvenile remained at the police station until her mother picked her up.

After she admitted to flushing the necklace down the toilet, the juvenile was charged with falsifying evidence. After a hearing in August 2011, she was found delinquent. During the merits hearing, she moved to suppress her admission on the ground that it was the product of custodial interrogation and that she was not advised of her *Miranda* rights before making it. The court denied her motion, and the juvenile appealed. We remanded the case for further fact finding.

On remand, the trial court conducted an evidentiary hearing at which the arresting officer was the only witness. At the hearing, the juvenile argued

that suppression of her response to the officer's question was required by both Part I, Article 15 of the State Constitution and the Fifth Amendment to the Federal Constitution. Following the hearing, the court granted the juvenile's motion to suppress her admission, and the State filed the instant appeal. The juvenile has not participated in this appeal. We have allowed the New Hampshire Appellate Defender Program to appear as *amicus curiae*.

## II. Legal Background

The Fifth Amendment to the Federal Constitution, which applies to the States by virtue of the Fourteenth Amendment, *Malloy v. Hogan*, 378 U.S. 1, 6 (1964), provides: "No person . . . shall be compelled in any criminal case to be a witness against himself." Part I, Article 15 of the State Constitution similarly provides: "No subject shall be . . . compelled to accuse or furnish evidence against himself."

■ In *Miranda*, the Supreme Court "addressed the problem of how the privilege against compelled self-incrimination guaranteed by the Fifth Amendment could be protected from the coercive pressures that can be brought to bear upon a suspect in the context of a custodial interrogation." *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984). "[T]he Court saw as inherently coercive any police custodial interrogation conducted by isolating the suspect with police officers; therefore, the Court established a *per se* rule that all incriminating statements made during such interrogation are barred as 'compelled.' " *United States v. Washington*, 431 U.S. 181, 187 n.5 (1977). The Court stated that "[e]ven without employing brutality [or] the 'third degree' . . . , the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Miranda*, 384 U.S. at 455. Consequently, the Court reasoned, "[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice." *Id.* at 458; *see Maryland v. Shatzer*, 559 U.S. 98, 103 (2010).

■ ■ "To counteract the coercive pressure, *Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney." *Shatzer*, 559 U.S. at 103-04; *see Miranda*, 384 U.S. at 444, 467-73. The central principle of *Miranda* is that "if the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt." *Berkemer*, 468 U.S. at 429. In *Benoit*, we held that Part I, Article 15 of the

State Constitution entitled a juvenile to be informed of her *Miranda* rights "in language understandable to a child." *Benoit*, 126 N.H. at 19.

Here, the trial court determined that the juvenile did not receive the procedural safeguards required by *Miranda* and *Benoit* before the officer questioned her regarding the object that she had flushed down the toilet. The trial court impliedly concluded that she was entitled to those safeguards because she was subject to custodial interrogation.

## III. Analysis

■ As a general rule, two conditions must be met before *Miranda* and *Benoit* warnings are required: (1) the suspect must be "in custody"; and (2) she must be subject to "interrogation." *See Miranda*, 384 U.S. at 478. The State appears to dispute that either condition was met in this case.

■ We first address the State's claims under the State Constitution and rely upon federal cases only to aid our analysis. *State v. Ball*, 124 N.H. 226, 231-33 (1983). "Because the ultimate determination of custody requires an application of a legal standard to historical facts, it is not merely a factual question but a mixed question of law and fact." *State v. Ford*, 144 N.H. 57, 62 (1999). Thus, we review the ultimate determination of custody *de novo*. *Id.* at 63. "We will not overturn the trial court's factual findings relevant to the question of custody unless they are contrary to the manifest weight of the evidence." *State v. Jennings*, 155 N.H. 768, 772-73 (2007). The State has not challenged any of the trial court's factual findings on appeal.

### A. Custody

■ "Custody entitling a defendant to *Miranda* protections requires formal arrest or restraint on freedom of movement to the degree associated with formal arrest." *Id.* at 772 (quotation omitted). "Absent a formal arrest, the trial court must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable [person] in the suspect's position would have understood his situation." *Ford*, 144 N.H. at 63 (quotation omitted). To determine whether a reasonable person in a suspect's position would believe herself to be in custody, the trial court should consider the totality of the circumstances of the encounter, including: the suspect's familiarity with her surroundings, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character. *State v. McKenna*, 166 N.H. 671, 677 (2014). Like the analysis used by other courts, our custody analysis is binary: we determine whether the suspect *either* is under formal arrest *or* has had her freedom of movement restricted to the degree associated with formal arrest. *See J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011)

(observing that to determine custody for *Miranda* purposes, "the ultimate inquiry" is "was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest" (quotation omitted)); *McKenna*, 166 N.H. at 679 (observing that "[c]ustody for *Miranda* purposes can arise because of a formal arrest or the functional equivalent of arrest"); *Jennings*, 155 N.H. at 772 (noting that the court determines whether the suspect's freedom of movement has been sufficiently curtailed only "[i]n the absence of formal arrest").

 Using our well-established custody analysis, there can be no question that the juvenile was in custody for *Miranda* and *Benoit* purposes. When she was interrogated, she was under formal arrest and had been taken to the police station. This is "the paradigmatic *Miranda* situation," in which a person has been "arrested . . . and whisked to a police station for questioning." *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012). She was subject to "incommunicado" interrogation in the very same "unfamiliar," "police-dominated atmosphere," as were the defendants in *Miranda*. *Miranda*, 384 U.S. at 456-57. She was interrogated in the very environment that the Court in *Miranda* decided involved "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467.

The State contends, however, that we should not apply our traditional test for determining custody, but should apply a test that we have previously applied only to prison and jail inmates. *See Ford*, 144 N.H. at 63-64. The State further contends that, under the test we apply to prison and jail inmates, the defendant was not "in custody."

 In *Ford*, we held that "[w]hen a defendant is already incarcerated at the time of interrogation, the traditional custody analysis is inappropriate." *Id.* at 63. This is so because our traditional analysis focuses upon the degree to which a suspect's "freedom of movement" is curtailed. *Id.* Because, "by its very nature, a prison setting restrains the freedom of movement of its inmates," we observed that applying our "traditional analysis" to "prisoner interrogation would lead inexorably to a *per se* rule that all interrogations of prison inmates are custodial." *Id.* We eschewed adopting such a *per se* rule, and, instead, held that "when an individual is incarcerated for an offense unrelated to the subject of his interrogation, custody for *Miranda* purposes occurs when there is some act or circumstance that places additional limitations on the prisoner." *Id.*

In *Ford*, we concluded that the defendant was not in custody when he was interviewed by police officers because: (1) he was interviewed "in a relatively [non-]coercive area of the prison, the correctional officers' lunch room, not a prison cell or interrogation room"; (2) he "was not pressured to

disclose information"; (3) he "was free to terminate the interview," and, at one point, did so, only to "call[ ] the officers back and agree[ ] to speak with them"; (4) he "largely controlled the topics discussed"; and (5) until he implicated himself, the officers did not consider him a suspect in the robbery to which he confessed. *Id.* at 64. We concluded that, because the circumstances surrounding the officers' questioning did not "impose[ ] any additional restraint on the defendant's freedom of movement," the defendant was not in custody. *Id.* We have applied *Ford* to a defendant confined pretrial at a county jail, *see State v. Pehowic*, 147 N.H. 52, 53, 55 (2001), and to a defendant who was at a county jail serving a sentence on a parole violation, *see State v. Dorval*, 144 N.H. 455, 455, 457 (1999).

*Ford*'s "additional limitations" test is consistent with the test used by numerous other jurisdictions. *See, e.g., Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir. 1978); *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985); *see also* 2 W. LAFAVE ET AL., CRIMINAL PROCEDURE § 6.6(b), at 724-25 (3d ed. 2007) (citing cases and explaining that "a unique body of caselaw has developed about the need for *Miranda* warnings in a prison setting" (quotation omitted)). *Ford* is also consistent with *Fields*, 132 S. Ct. at 1192. In *Fields*, the Supreme Court declined to adopt a *per se* rule that a prison inmate is in custody for *Miranda* purposes solely because of his incarceration, and, instead, ruled that "[w]hen a prisoner is questioned, the determination of custody should focus on all of the features of the interrogation," including "the language that is used in summoning the prisoner to the interview and the manner in which the interrogation is conducted." *Fields*, 132 S. Ct. at 1192.

The State asserts that the "additional limitations" test applies to the juvenile because "she was not questioned about the crime for which she was arrested." We disagree with the State that the question to the juvenile was not about the shoplifting offense for which she was arrested. Moreover, even if the question concerned a different offense, we conclude that our traditional custody analysis would still apply. *See Mathis v. United States*, 391 U.S. 1 (1968), *clarified by Fields*, 132 S. Ct. at 1188; *see also* 2 LAFAVE *supra* § 6.6(b), at 724 ("*Miranda* applies to interrogation of one in custody for another purpose or with respect to another offense"); 1 C. WRIGHT & A. LEIPOLD, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 75, at 206 (4th ed. 2008) ("If a person is in custody, the Miranda rules apply even though the interrogation of him relates to an investigation unrelated to the reason he is in custody.").

The State argues that the "additional limitations" test should control regardless of whether "a juvenile is being held under arrest in a police station" or is subject "to a more lengthy detention, such as in a youth facility." However, like the United States Supreme Court, we discern an

important distinction between an arrestee, who is temporarily detained in a police station booking room, on one hand, and an inmate in a prison or jail, on the other hand. As the Court observed in *Fields*, a person who is arrested "is cut off from his normal life and companions and abruptly transported from the street into a police-dominated atmosphere." *Fields*, 132 S. Ct. at 1190 (quotations and citations omitted). By contrast, "questioning a person who is already serving a prison term" generally does not "involve the shock that very often accompanies arrest." *Id.*

Moreover, an arrestee is subject to a "sharp and ominous change" in environment when arrested and then "whisked to a police station for questioning," and the shock of such a change "may give rise to coercive pressures." *Id.* "By contrast, when a person who is already serving a term of imprisonment is questioned, there is usually no such change" in environment. *Id.* at 1190-91. "Interrogated suspects who have previously been convicted of crime live in prison," and the "ordinary restrictions of prison life . . . are expected and familiar and thus do not involve the same inherently compulsive pressures that are often present when a suspect is yanked from familiar surroundings . . . and subjected to interrogation in a police station." *Id.* at 1191 (quotation omitted).

Additionally, "[w]hen a person is arrested and taken to a [police] station . . . for interrogation, [he] . . . may be pressured to speak by the hope that, after doing so, he will be allowed to leave and go home." *Id.* "On the other hand, when a prisoner is questioned, he knows that when the questioning ceases, he will remain under confinement." *Id.* Further, a prisoner, serving a sentence after conviction, "knows that the law enforcement officers who question him lack the authority to affect the duration of his sentence." *Id.*

"In short," arrest, unlike the "standard conditions of confinement" for a prison or jail inmate, necessarily implicates the very interests that the Supreme Court "sought to protect when it afforded special safeguards to persons subjected to custodial interrogation." *Id.*

The State has cited, and we have found, only one case that applies the "additional limitations" test to an arrestee temporarily detained while awaiting further processing. *See Herrera v. State*, 241 S.W.3d 520 (Tex. Crim. App. 2007). The suspect in *Herrera* was involved in a fight outside of a bar. *Id.* at 522. After he was questioned, he was arrested on an outstanding warrant and transported to the county jail. *Id.* The next morning, he was interviewed at the jail about the fight and told a police investigator that he had a knife during the fight, although he denied using it. *Id.* at 522-23. He sought to suppress his statement on the ground that, when he was questioned, he was in custody "because he was an inmate in the county jail." *Id.* at 527. The court "refuse[d] to equate incarceration

with 'custody' for purposes of *Miranda* when an inmate is questioned . . . about an offense unrelated to the inmate's incarceration." *Id.* at 532. Instead, the court applied a test similar to our "additional limitations" test and determined that, under that test, the suspect was not in custody for *Miranda* purposes. *Id.* at 532-33.

*Herrera* is distinguishable from this case. Unlike the arrestee in *Herrera*, who was interrogated after having been detained overnight in a county jail, the juvenile was interrogated shortly after having been arrested, while she was still in the booking room of the police station and, arguably, while she was still under the shock that accompanied her original arrest. *See Fields*, 132 S. Ct. at 1190. Additionally, while the arrestee in *Herrera* was an adult, the juvenile was fourteen years old at the time of her arrest, and, therefore, was more likely to feel coercive pressure as a result of her arrest. *See J.D.B.*, 131 S. Ct. at 2402-08. Moreover, even if this case were not factually distinguishable, *Herrera*, standing alone, does not persuade us that we should apply the "additional limitations" test to the facts of this case.

Here, because we have concluded that the juvenile was in custody for *Miranda* purposes, she was entitled to *Miranda* and *Benoit* warnings before being subject to "interrogation." We turn next to analyzing whether she was, in fact, interrogated.

### B. Interrogation

█ "Interrogation for *Miranda* purposes occurs when a person in custody is subjected to either express questioning or its functional equivalent." *State v. Gribble*, 165 N.H. 1, 11 (2013) (quotation omitted). The functional equivalent of interrogation refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "The functional equivalent aspect of the term focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *Gribble*, 165 N.H. at 11 (quotations omitted). "This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police." *Id.* at 11-12 (quotation omitted).

█ In this case, the juvenile was directly asked about what she flushed down the toilet. Given that she had just been arrested for shoplifting jewelry, we have "a difficult time reaching the conclusion that the question was meant to do anything other than garner a potentially incriminating response" from the juvenile. *United States v. Stately*, Criminal No.

13-280(1)(DWF/LIB), 2014 WL 668167, at *7-8 (D. Minn. Feb. 20, 2014) (determining that asking a suspect whether there were any guns in the vehicle constituted interrogation when he had been stopped because he was suspected of having fired a gun, was "unequivocally in custody," and the question was reasonably likely to elicit an incriminating response). Accordingly, we hold that she was subject to interrogation within the meaning of *Miranda*.

■ The State argues that, even though the juvenile was in custody, she was not "interrogated" for *Miranda* purposes but was, instead, subject to "[g]eneral on-the-scene questioning." *Miranda*, 384 U.S. at 477. The State's argument is based upon the following passage from *Miranda*:

> Our decision is not intended to hamper the traditional function of police officers in investigating crime. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present.

*Id.* at 477-78 (citation omitted). However, the State has not cited, nor have we found, any case in which a court has allowed "on-the-scene questioning" of a suspect who is already in custody for *Miranda* purposes. *Miranda* warnings are not required for "on-the-scene" questioning precisely *"because* the individuals being questioned are not in custody at all and there is no coercive atmosphere." *United States v. Thomas*, Crim. No. 12-128 (MJD/JJK), 2012 WL 6812536, at *8 (D. Minn. Dec. 19, 2012) (emphasis added). The questioning here occurred shortly after the juvenile was arrested, and, therefore, in custody for *Miranda* purposes. Moreover, the question itself revealed to the juvenile that she was being observed while using the toilet. The questioning here did not take place in a non-coercive atmosphere.

"[T]he circumstances of this case simply do not involve general on-the-scene questioning of the type the Supreme Court discussed in *Miranda*." *Id.* "This case involves a coercive pressure on a restrained individual's will that is fundamentally different than the non-coercive atmosphere when an officer meets with citizens on the street or in their homes to ask questions as part of the fact-gathering part of investigation." *Id.* The pointed question

in this case, asking the juvenile what she flushed down the toilet, "was not benign." *Stately,* 2014 WL 668167, at *8. Asking the juvenile that question, shortly after she was formally arrested for shoplifting, transported in handcuffs to the police station, and detained in a locked booking room, "is fundamentally different from a police officer . . . ask[ing] unrestrained citizens what they know about a suspected crime." *Thomas,* 2012 WL 6812536, at *8.

In support of its "on-the-scene questioning" argument, the State relies *entirely* upon cases involving questioning an inmate in a prison, jail, or juvenile detention facility. *See Cervantes,* 589 F.2d at 426-27 (county jail); *In re D.F.,* 951 N.E.2d 99, 100-01 (Ohio Ct. App. 2011) (juvenile detention facility); *In re JOE L.,* No. B180443, 2006 WL 696693, at *1 (Cal. Ct. App. Mar. 21, 2006) (juvenile correctional facility);[*] *In re Jacob R.,* No. 1 CA-JV 09-0143, 2010 WL 1729881, at *1 (Ariz. Ct. App. Apr. 29, 2010) (juvenile correctional facility). In all of these cases, the suspects were deemed *not* to be in custody for *Miranda* purposes when they were subjected to "on-the-scene questioning." *See Cervantes,* 589 F.2d at 429; *In re D.F.,* 951 N.E.2d at 103; *In re JOE L.,* 2006 WL 696693, at *2-3; *In re Jacob R.,* 2010 WL 1729881, at *2-3. None of these cases requires us to conclude that in this case, there was only on-the-scene questioning or that the juvenile was not subject to custodial interrogation.

Moreover, the State does not contend that there was a public safety emergency that necessitated asking the juvenile the question without first advising her of her *Miranda* and *Benoit* rights. *See New York v. Quarles,* 467 U.S. 649, 657-58 (1984) (recognizing a "narrow" public safety exception to *Miranda* based upon court's conclusion "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"); *State v. Lopez,* 139 N.H. 309, 311 (1994) (leaving open the question of whether we recognize a "public safety" exception to *Miranda* under the State Constitution). Were we to hold that the officer's question about what the juvenile flushed down the toilet constituted merely general "on-the-scene questioning" not subject to *Miranda,* we would create an exception to *Miranda* that would swallow the rule. We decline to do so. Although the State suggests that this is "an absurd result," we disagree — it is the result that *Miranda* requires.

---

[*] Although California Rule of Court 8.1115 provides that "an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication . . . must not be cited or relied on by a court or a party in any other action," we cite *In re JOE L.,* No. B180443, 2006 WL 696693 (Cal. Ct. App. Mar. 21, 2006), because the State has relied upon it.

*IV. Conclusion*

In sum, we conclude that the juvenile in this case was in custody for *Miranda* and *Benoit* purposes when she was interrogated in a locked booking room in the police station, shortly after she was arrested. Because she was entitled to receive, but did not receive, *Miranda* and *Benoit* warnings before being interrogated, her admission that she flushed a necklace down the toilet was the product of custodial interrogation and, as such, was properly suppressed. In light of the result we reach under the State Constitution, we need not reach the State's arguments under the Federal Constitution. *See Ball*, 124 N.H. at 237.

*Affirmed.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred; LYNN, J., dissented.

LYNN, J., dissenting. Because I do not agree that the single question asked of the juvenile by the arresting officer concerning new suspicious conduct she committed after being arrested and brought to the police station constitutes custodial interrogation within the meaning of *Miranda v. Arizona*, 384 U.S. 436 (1966), I would reverse the trial court's ruling granting her motion to suppress her statement. Therefore, I respectfully dissent.

I

I do not dispute the facts as recited by the majority, but add some details drawn from the testimony at the adjudicatory hearing and at the suppression hearing. Such details help in understanding the precise context in which the question was asked and the answer given, which is important to a resolution of the propriety of the police action. The arresting officer, Eric Pappalardo, was called to the Rockingham Mall at approximately 4:30 p.m. on May 28, 2011, to respond to an incident of shoplifting. Upon arrival, Pappalardo spoke with a mall security officer as well as a representative of Claire's Store, who showed him merchandise from the store that had been recovered from the juvenile when she was detained. Pappalardo then placed the juvenile under arrest, handcuffed her, and transported her to the Salem Police Department. There is no evidence indicating that at the time of the arrest the juvenile was searched, frisked, interrogated, or advised of her *Miranda* rights. During the booking process at the police station and after her handcuffs had been removed, the juvenile asked if she could use the bathroom. Pappalardo allowed her to do so, and directed her to a toilet located in a row of cells adjacent to the booking room. Although

the perimeter of the combined cellblock and booking room area was secured, so that the juvenile could not leave this area, the door between the booking room and the cellblock was open, as was the door to the cell the juvenile entered to use the toilet. Pappalardo did not accompany the juvenile into the cell; rather, he returned to the booking room, from which he could not see the cell that the juvenile entered.

The cellblock area of the police department is monitored by video cameras. While the juvenile was in the cell, Lieutenant Peddle, who was in his office, observed on the video monitor that the juvenile appeared to flush the toilet without having used it. Peddle immediately went to the booking room and informed Pappalardo about what he had observed, indicating that it looked like the juvenile had flushed something down the toilet. When the juvenile returned, Pappalardo asked her, without first advising her of her *Miranda* rights, what she had flushed down the toilet. The juvenile responded that she had flushed a necklace that she had taken and had concealed in her pants.

## II

Before turning to the specific issue before us, I believe it helpful to review generally the circumstances in which the prophylactic protections of *Miranda* have been held not to come into play. The majority correctly observes that two basic conditions must be met before *Miranda* warnings are required: (1) custody and (2) interrogation. *See Miranda*, 348 U.S. at 478. But as both United States Supreme Court and our own case law make clear, for *Miranda* purposes "custody" and "interrogation" have become terms of art with specialized meanings more limited than common usage or the dictionary definitions of the terms would indicate. *See Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."). For example, a person who has been "seized" by the police during a *Terry*[1] stop might, in common understanding, be thought to be in custody because the person has been restrained by the police and is not free to leave. But the law is very clear that such a person is not in custody for *Miranda* purposes. *See State v. Turmel*, 150 N.H. 377, 383 (2003). Because police must have reasonable suspicion to believe that the person has engaged, is engaging, or is about to engage in criminal activity as a prerequisite to effectuating a *Terry* stop, *see id.* at 380, there is reason to believe that the person may provide self-incriminating responses when the officer makes inquiry regarding such activity. Notwithstanding that the person's response may confirm a police

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

officer's suspicions, the officer is entitled to ask a "moderate number of questions" during the stop without advising the suspect of his or her *Miranda* rights. *Id.* at 383. The *Terry* doctrine is completely consistent with that portion of the Supreme Court's earlier decision in *Miranda*, in which it stated that "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." *Miranda*, 384 U.S. at 477.

Courts also have recognized several other circumstances in which *Miranda* does not apply even though a suspect is unquestionably in the custody of police or correctional authorities and is subjected to interrogation, *i.e.*, is asked questions, by such authorities. In *New York v. Quarles*, 467 U.S. 649 (1984), the Supreme Court recognized a public safety exception to *Miranda*, holding that "the doctrinal underpinnings of *Miranda* [do not] require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Quarles*, 467 U.S. at 656.

In *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), a four-justice plurality of the Court recognized a "routine booking question exception" that "exempts from *Miranda*'s coverage questions to secure the 'biographical data necessary to complete booking or pretrial services.'" *Muniz*, 496 U.S. at 601. Although rejecting Pennsylvania's assertion that the booking questions should not be regarded as custodial interrogation because they were "not intended to elicit information for investigatory purposes," *id.*, the plurality concluded that "the questions fall outside the protections of *Miranda*" because they were "reasonably related to the police's administrative concerns." *Muniz*, 496 U.S. at 601-02. *Muniz* is consistent with the Court's earlier decision in *Rhode Island v. Innis*, 446 U.S. 291 (1980), in which it held that "'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (emphasis added; footnotes omitted);[2] *see also South Dakota v. Neville*, 459 U.S. 553, 564 n.15 (1983)

---

[2] In *Alford v. State*, 358 S.W.3d 647 (Tex. Crim. App. 2012), the court observed the arguable tension between *Muniz*'s disallowance of booking questions that are "*designed* [by the police] to elicit incriminatory admissions," *Muniz*, 496 U.S. at 602 n.14 (emphasis added), and the holding in *Innis* that interrogation for *Miranda* purposes includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police *should know are reasonably likely* to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301 (emphasis added; footnotes omitted). After reviewing the divergent manner in which courts have interpreted the "booking questions" exception, *see Alford*, 358 S.W.3d at 656-59, the court held that the exception was to be applied based on an objective assessment of "whether, under the totality of the circumstances, a question is reasonably

("In the context of an arrest for driving while intoxicated, a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda*."); *United States v. Woods*, 711 F.3d 737, 741 (6th Cir. 2013) (holding that police officer's question to arrested subject about contents of his pockets did not constitute custodial interrogation requiring *Miranda* warnings; "[t]o say that [the police officer] had the right to physically go through Woods's pockets but could not simply ask him 'What is in your pocket?' would be illogical").

In *Illinois v. Perkins*, 496 U.S. 292 (1990), the Court held that *Miranda* did not apply to a situation in which an undercover government agent was placed in the cellblock of a suspect who had been incarcerated for two days[3] while awaiting trial, and engaged him in conversation designed to elicit the suspect's involvement in an unrelated murder. *Perkins*, 496 U.S. at 300. The Court

> reject[ed] the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent. Questioning by captors, who appear to control the suspect's fate, may create mutually reinforcing pressures that the Court has assumed will weaken the suspect's will, but where a suspect does not know that he is conversing with a government agent, these pressures do not exist.

*Id.* at 297. The Court distinguished *Perkins* from *Mathis v. United States*, 391 U.S. 1 (1968), in which it had held that an incarcerated person must be given *Miranda* warnings even if the questioning relates to an offense unrelated to the basis for incarceration, on the ground that in *Mathis* the suspect knew his interrogator was a government agent. *Perkins*, 496 U.S. at 299. Significantly, however, the Court also added: "The *bare fact of custody* may not in every instance require a warning even when the suspect is aware that he is speaking to an official, but we do not have occasion to explore that issue here." *Id.* (emphasis added).

Yet another circumstance in which *Miranda* has been held not automatically applicable despite the fact that both custody and interrogation in a generic sense clearly exist, involves the questioning of persons who are

---

related to a legitimate administrative concern," *id.* at 661, "regardless of whether police should know that such questions are reasonably likely to elicit incriminating information." *Id.* at 660. The court did not reach the question of "whether there is any limitation to the booking exception when an officer's actual intent was to elicit incriminating admissions through questions characterized by the officer as booking questions." *Id.* at 660 n.27.

[3] *See Perkins*, 496 U.S. at 304 (*Marshall*, J., dissenting) (reciting that Perkins had been in jail for two days prior to his interaction with the undercover agent).

incarcerated in a jail or prison about conduct other than that on which the incarceration is based. Although *Mathis* established the rule that a person who is otherwise in custody must be given *Miranda* warnings even if he is questioned about a subject unrelated to the reason for his incarceration and even if there is no criminal investigation pending when the questioning occurs, it did not address the core question of whether incarceration itself is sufficient to constitute custody. *See Fields*, 132 S. Ct. at 1188. Answering the question left open in *Mathis* and *Perkins*, the Court made it clear in its later decisions in *Maryland v. Shatzer*, 559 U.S. 98 (2010), and *Fields*, that "service of a term of imprisonment, without more, is not enough to constitute *Miranda* custody." *Fields*, 132 S. Ct. at 1191; *see also State v. Dorval*, 144 N.H. 455, 455-56, 457 (1999) (holding that defendant was not in custody for *Miranda* purposes when questioned by police about unrelated offense while serving a sixty-day sentence for parole violation). Although *Shatzer* and *Fields* involved individuals who were serving sentences, both this and other courts have applied the rule that incarceration does not automatically equal custody for *Miranda* purposes even when the person questioned was not serving a sentence, but, rather, was being held in jail or prison awaiting trial. *See United States v. Ellison*, 632 F.3d 727, 730 (1st Cir. 2010); *State v. Ford*, 144 N.H. 57, 59, 64 (1999); *State v. Pehowic*, 147 N.H. 52, 53, 55 (2001).

Finally, courts have recognized a "new crime" exception to *Miranda*. Under this exception, a statement made by a person who is under arrest and is subject to questioning not preceded by *Miranda* warnings is admissible as evidence if the statement itself constitutes a new crime. *See State v. Tucker*, 145 N.H. 723, 726-27 (2001); *accord United States v. Paskett*, 950 F.2d 705, 707-08 (11th Cir. 1992); *United States v. Kirk*, 528 F.2d 1057, 1062 (5th Cir. 1976) ("[N]o fifth amendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged.").

Application of the *Miranda* rule is not a cost free exercise. As a prophylactic rule, it by definition excludes from evidence some statements that are made freely and voluntarily. And of course, "Voluntary confessions are not merely a proper element in law enforcement, they are an unmitigated good, essential to society's compelling interest in finding, convicting, and punishing those who violate the law." *Shatzer*, 559 U.S. at 108 (quotations and citations omitted). Collectively, the cases discussed above demonstrate a variety of circumstances in which, for one reason or another, courts have found that the costs of applying *Miranda* are too high. As explained below, this case fits comfortably within the *Miranda* exception recognized in *Cervantes v. Walker*, 589 F.2d 424 (9th Cir. 1978), and its

progeny for on-the-scene questioning of incarcerated individuals regarding suspected ongoing or recently-committed suspicious activity within the place of confinement.

## III

The majority's conclusion that the defendant was in custody for *Miranda* purposes when Pappalardo asked her what she had flushed down the toilet is based primarily on its determination that this case is distinguishable from *Fields*. In particular, the majority focuses on the fact that, unlike the defendant in *Fields*, who was already serving a prison sentence at the time he was questioned and thus did not experience the shock and sudden isolation that normally accompanies an arrest, the juvenile here was still subject to these coercive pressures because the questioning took place shortly after she was arrested and "whisked away" to the police station. The majority also relies on the fact that this case involves a minor who may be more likely than an adult to feel coercive pressure as a result of police questioning. *See J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2403 (2011). I acknowledge that this case is distinguishable from *Fields* both in terms of the temporal proximity between the juvenile's removal from the community (by arrest) and the questioning at issue, and because of her status as a minor, and that both of these factors weigh in favor of a finding that she was in custody for the purposes of *Miranda*. But, in my view, these factors are outweighed by a number of countervailing considerations that persuade me that what occurred here did not amount to custodial interrogation within the meaning of *Miranda*.[4]

As the Court makes clear in *Fields*, the seminal question for purposes of determining *Miranda* custody is not simply the degree to which a person's

---

[4] The *Fields* Court also found that, unlike a person recently arrested, a sentenced prisoner: (1) would not feel "pressured to speak by the hope that, after doing so, he will be allowed to leave and go home" because "he knows that when the questioning ceases, he will remain under confinement"; and (2) "knows that the law enforcement officers who question him probably lack the authority to affect the duration of his sentence." *Fields*, 132 S. Ct. at 1191. Although these may be valid distinctions between a prisoner serving a sentence and a person recently arrested, it is not at all clear that such distinctions exist between a person recently arrested and a person being held in jail awaiting trial. On the contrary, notwithstanding that a pretrial detainee may be held on charges different from those about which he is questioned by the police, he may well believe that cooperating with the police by answering their questions will assist him in securing pretrial release, reduced bail, and/or a more favorable disposition on the charges on which he is already being held. In short, the prospect that a detainee may be desirous of achieving a global settlement of all his difficulties with the law is hardly an unheard of phenomenon. *See Ellison*, 632 F.3d at 730. In fact, as the Court recognized in *Minnick v. Mississippi*, 498 U.S. 146 (1990), it is entirely possible that coercive pressures "may increase as custody is prolonged." *Minnick*, 498 U.S. at 153. Nonetheless, the prospect that a pretrial detainee may experience such potentially coercive pressures has not led us to hold that such persons are *per se* in custody for *Miranda* purposes. *See Ford*, 144 N.H. at 59, 64; *Pehowic*, 147 N.H at 53, 55.

freedom of movement has been restricted, but "whether the relevant environment presents the same inherently coercive pressures *as the type of station house questioning at issue in Miranda.*" *Fields,* 132 S. Ct. at 1190 (emphasis added). To determine whether such *Miranda*-like coercive pressures exist, a court must examine *all* the relevant circumstances, not just the age of the arrestee and the time interval between the arrest and the questioning. Among the other factors that are relevant to the determination of *Miranda* custody are the location of the questioning, its duration, the language used in summoning the person, statements made during the interview, the presence or absence of physical restraints, and the release of the interviewee at the end of the questioning. *See id.* at 1189, 1192.

As noted above, in *Miranda,* the Supreme Court explicitly excepted from the prophylactic warnings requirement "[g]eneral on-the-scene questioning as to facts surrounding a crime." *Miranda,* 384 U.S. at 477. Relying on this exception, a substantial body of case law has developed which holds that warnings need not precede general questioning of this type even when the crime scene is a jail, prison, or detention facility and the person questioned is being held there for an earlier offense. The seminal case on point is *Cervantes v. Walker,* 589 F.2d 424 (9th Cir. 1978). In that case, the defendant was an inmate at a county jail. While he was being moved to a new cell, a prison officer searched his belongings and found a matchbox containing what looked like marijuana. *Cervantes,* 589 F.2d at 426-27. Without administering *Miranda* warnings, the officer asked, "What's this?" The defendant replied, "That's grass, man." *Id.* at 427. Relying on *Mathis,* the defendant argued that because he was incarcerated at the time of questioning, his *Miranda* rights had been violated. The court disagreed, writing:

> To interpret *Mathis* as Cervantes urges would, in effect, create a per se rule that any investigatory questioning inside a prison requires *Miranda* warnings. Such a rule could totally disrupt prison administration. *Miranda* certainly does not dictate such a consequence. . . .
>
> Adoption of Cervantes' contention would not only be inconsistent with *Miranda* but would torture it to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart. We cannot believe the Supreme Court intended such a result.

*Id.*

The court went on to hold that for a prisoner to be considered in custody for *Miranda* purposes, there must be "a change in the surroundings of the prisoner which results in an added imposition on his freedom of move-

ment"; that is, "some act which places further limitations on the prisoner." *Id.* at 428. Applying this standard, the court relied on the following circumstances in concluding that the defendant had not been subjected to custodial interrogation within the meaning of *Miranda*:

> The marijuana was uncovered in the course of a routine search. [The officer's] question sought to ascertain the nature of the substance. The questioning took place in the prison library and appears to have been a spontaneous reaction to the discovery. Under these circumstances, we also conclude that neither the prison setting nor the presence of [the two officers] exerted a pressure to detain sufficient to have caused a reasonable person to believe his freedom of movement had been further diminished. Rather, this was an instance of on-the-scene questioning enabling [the officer] to determine whether a crime was in progress.

*Id.* at 429.

*Cervantes* has been followed by other state and federal courts, *see Garcia v. Singletary*, 13 F.3d 1487, 1491-92 (11th Cir. 1994); *United States v. Conley*, 779 F.2d 970, 972-74 (4th Cir. 1985); *United States v. Scalf*, 725 F.2d 1272, 1276 (10th Cir. 1984); *Herrera v. State*, 241 S.W.3d 520, 527-33 (Tex. Crim. App. 2007), and its reasoning essentially formed the basis for the "additional limitations" test we employed in *Ford*. *See Ford*, 144 N.H. at 63-64.

Courts also have routinely applied the *Cervantes* rationale to cases involving juveniles who are questioned about ongoing or recently-occurring offenses committed while they are incarcerated on other charges. For example, in *In re D.F.*, 951 N.E.2d 99 (Ohio Ct. App. 2011), residents in a juvenile detention facility were lined up when a pen (a potential weapon) was discovered missing. *In re D.F.*, 951 N.E.2d at 100-01. The appellant volunteered that another resident had taken the pen and flushed it down the toilet. *Id.* at 101. Questioning of the other resident revealed that he had possession of a pill that had been dispensed by the staff to the appellant. *Id.* When the appellant was then asked, without benefit of *Miranda* warnings, how the other resident came to possess the pill, he admitted that he had "cheeked it" rather than consume it. *Id.* The court rejected the appellant's claim that the questioning violated *Miranda*:

> The encounter lasted only one to two minutes in appellant's own cell. He was not handcuffed, searched, or removed from the general facility population. This was an on-the-scene investigation of a missing potentially dangerous object and then a contemporaneous investigation of a drug offense by corrections officers in a

prison setting. Under the totality of the circumstances, appellant's freedom of movement was not imposed upon over and above the normal situation in the detention facility environment. Therefore, *Miranda* warnings were unnecessary.

*Id.* at 103; *see also In re Jacob R.*, No. 1 CA-JV 09-0143, 2010 WL 1729881, at *3 (Ariz. Ct. App. Apr. 29, 2010); *In re JOE L.*, No. B180443, 2006 WL 696693, at *2-3 (Cal. Ct. App. Mar. 21, 2006).

The majority asserts that "the State has not cited, nor have we found, any case in which a court has allowed 'on-the-scene questioning' of a suspect who is already in custody for *Miranda* purposes." *Ante* at 347. This assertion is unpersuasive because it assumes the very point at issue. The question in *Cervantes* and all the cases that follow it was whether the person was in fact in custody for *Miranda* purposes. In each of those cases, the defendant contended that he was in custody because he was incarcerated, and therefore, not free to leave. In each case, the court rejected the argument because the circumstances of the questioning did not present sufficient additional indicia of coercive pressures beyond the baseline inherent in incarceration itself. That is the same point at issue here — whether, despite being incarcerated at the police station, the defendant was in custody for *Miranda* purposes when questioned by Officer Pappalardo. Merely because the majority chooses not to apply the reasoning of these cases to the circumstances presented here does not mean that the cases can simply be ignored.

This case is distinguishable from *Fields* in two crucial respects that the majority fails to recognize. First, unlike this case, *Fields* did not involve questioning about recently-committed suspicious conduct occurring at the place of incarceration after the suspect was jailed for other reasons. On the contrary, in *Fields*, the defendant was questioned about alleged sexual assaults that occurred before he began serving his sentence. *Fields*, 132 S. Ct. at 1185. Second, unlike the single question asked of the juvenile here, *Fields* was questioned by the sheriff's deputies *for five to seven hours. Id.* at 1186. In short, the facts and circumstances of *Fields* are such that no one could seriously contend that the questioning there at issue was justified under *Miranda*'s on-the-scene questioning rubric. By contrast, in this case, Pappalardo's "what did you just flush" inquiry that immediately followed the juvenile's return from the toilet constitutes a prototypical example of the type of crime-scene questioning that *Miranda* and its progeny hold need not be preceded by warnings.

The above distinctions between this case and *Fields* are significant because, as *Miranda*, *Terry*,[5] the *Cervantes-Ford* line of cases, and cases such as *Wolff v. McDonnell*, 418 U.S. 539 (1974), recognize, law enforcement and correctional authorities have an especially strong interest both in being able to respond quickly to emergent criminal activity and in maintaining the integrity of facilities that house those held for or convicted of violating the criminal law. The majority's refusal to employ the *Cervantes-Ford* analysis to this case produces the strange result that, by timing the commission of her new crime sufficiently close to her arrest that she may claim to be still subject to the coercive pressures of that event, the juvenile is able to preclude the police from conducting the normal on-the-scene questioning they would typically be able to employ in investigating a new crime. As the State aptly observes, if upon his arrival at the mall but prior to placing the juvenile under arrest, Officer Pappalardo had observed her attempting to discard the stolen jewelry, *Terry* unquestionably would have permitted him to ask her what she was doing without advising her of her *Miranda* rights. By the same token, under the majority's reasoning, if the juvenile's mother had not been available to pick her up and she instead had been transferred to a detention facility or detained at the police station for a sufficient period of time to have "settled in" to her new environment before she attempted to discard the jewelry, she also presumably could have been asked about what she was doing without *Miranda* warnings. *See Ford*, 144 N.H. at 63. Like Goldilocks's third bowl of porridge, however, the majority finds the juvenile's timing to be "just right" to preclude application of the *Miranda* exception for on-the-scene questioning. I see no justification for this odd outcome, which expands the scope of *Miranda* beyond its doctrinal underpinnings, and permits the juvenile, through the timing of her own bad behavior, to effectively create an "on-the-scene-questioning-free-zone" that precludes the police from employing what would otherwise be standard police crime-scene procedures.

Far from being cowed by the "shock and awe" of arrest, as the majority hypothesizes, the juvenile's actions objectively demonstrate that she was so unfazed by her arrest that, virtually without losing a beat, she promptly set about committing a new crime after arriving at the police station. Under the *Cervantes-Ford* rationale, which I believe should control our analysis, Officer Pappalardo was permitted to question the juvenile about the suspicious activity Lieutenant Peddle had just observed on the surveillance camera without administering *Miranda* warnings, provided that the cir-

---

[5] *See Terry*, 392 U.S. at 20 ("But we deal here with an entire rubric of police conduct — necessarily swift action predicated upon the on-the-spot observations of the officer on the beat — which historically has not been, and as a practical matter could not be, subjected to the warrant procedure.").

cumstances of the questioning did not impose significant additional limitations beyond those inherent in her status as a person held under incarceration. The facts here easily satisfy this standard. The juvenile proceeded to and from the cellblock toilet on her own, unaccompanied by officers. She was not handcuffed at the time. Although the circumference of the booking room and cellblock area was secure, the door between the two was open and the individual cells were not locked, meaning that the open area to which the juvenile had access appears to have been far larger than, say, a typical interview room. When the juvenile emerged from the cellblock, Pappalardo did not physically restrain her or engage in any other threatening words or conduct. Rather, he simply approached her and asked a single question — "What did you flush down the toilet?" Upon admitting that she had flushed a necklace that she had taken and concealed in her pants, she was not asked any further questions, and simply remained in detention at the police station until her mother picked her up.

Despite the fact that the trial court made no finding on this point, the majority opines that the State is incorrect in asserting that the question asked by Pappalardo was "not about the shoplifting offense for which [the juvenile] was arrested," *ante* at 344, and it later asserts that "[t]he pointed question in this case, asking the juvenile what she had flushed down the toilet, 'was not benign.' " *Ante* at 347-348. If what the majority means by these statements is that, given the nature of the charge for which the juvenile had been arrested (shoplifting), Pappalardo might reasonably have anticipated that one possible answer to his question would be that the juvenile had sought to dispose of evidence of the crime, I do not disagree that such an answer was one of many reasonable possibilities. But as discussed earlier, even police officers questioning a suspect whose freedom has been curtailed from that which existed immediately before he is subjected to a *Terry* stop may ask questions that, by definition, may reasonably confirm (as well as dispel) the officer's suspicions. There is no reason for a different result where, as here, the juvenile's freedom at the time of Pappalardo's question was not further curtailed from that which already existed as a result of her arrest and detention at the police station. Moreover, as Pappalardo explained at the suppression hearing, "he wasn't sure if it was evidence or drugs or what it was" that she had flushed. It just as plausibly could have been some other small object that could be used as a weapon or that potentially could have interfered with the proper operation of the toilet. The important point is that, irrespective of these various possibilities, the circumstances were sufficiently suggestive of new criminal conduct beyond that for which the juvenile had already been arrested to justify on-the-scene questioning regarding such conduct. It might be the case that, once the juvenile's answer clearly established the connection between the new

crime and the one for which she had been arrested, further questioning about the related matters would no longer be justified without administering *Miranda* warnings, but we are not faced with that issue here because Pappalardo asked no further questions.

The two Minnesota federal court cases on which the majority relies are readily distinguishable from this case, and one of them actually supports my conclusion that the questioning in this case did not involve custodial interrogation. *United States v. Stately*, Criminal No. 13-280(1) (DWF/LIB), 2014 WL 668167 (D. Minn. Feb. 20, 2014), is inapposite in that it did not involve a situation in which, after being arrested or incarcerated for a crime, the defendant then committed a new offense. Thus, the additional limitations test was simply not implicated in that case. Nonetheless, the court's conclusion that the defendant in *Stately* was in *Miranda* custody merely because he had been handcuffed, placed in a police cruiser, and advised that he was being detained is questionable. *See State v. Reid*, 135 N.H. 376, 381-82 (1992) (defendant who was frisked, handcuffed, and placed in police cruiser was seized but not arrested prior to arrival of another officer who identified him).

In *United States v. Thomas*, Crim. No. 12-128 (MJD/JJK), 2012 WL 6812536 (D. Minn. Dec. 19, 2012), the defendant was suspected of assaulting a fellow inmate. In contrast to this case, Thomas was questioned by a corrections supervisor several minutes after the staff had gained control of the situation and while she was handcuffed and physically held from behind by the officer as she was escorted to a special area of the prison where inmates are segregated from the general population. *Thomas*, 2012 WL 6812536, at *1-3. The court found that these circumstances involved sufficient additional restrictions beyond those inherent in incarceration to constitute *Miranda* custody. *Id.* at *9. However, in an observation that is prescient of what the proper result should be in this case, the court observed: "This might be a different case if, upon reaching [the crime scene], Lieutenant Dern had excitedly blurted out 'What happened? What's going on? What is that rope for?' and Defendant made her statements then." *Id.* The circumstances of this case are, I submit, far closer to those of the foregoing hypothetical than they are to the actual facts presented in *Thomas*, and consequently the outcome of that case should not control the result here.

Although the majority does not explicitly say as much, its holding effectively reads *Fields* as limiting the *Cervantes-Ford* line of cases so as to allow questioning of incarcerated persons without *Miranda* warnings only when such persons are sufficiently settled into incarceration that the putative upheaval of removal from the community has dissipated. I believe that this is far too broad a reading of *Fields*, given that: (1) the case dealt

only with a sentenced prisoner; and (2) did not involve the situation of an on-going or recently-committed offense occurring within the place of confinement. Law enforcement and corrections authorities obviously have an interest in being able to respond quickly and decisively to emergent criminal conduct, especially that occurring in the often highly-charged environment of a prison or detention facility. That interest exceeds even the weighty governmental interests at stake in investigating past criminal conduct. Indeed, recognition of this interest is the very foundation of the *Terry* doctrine. Moreover, as noted previously, unlike sentenced prisoners, persons held in pretrial status may very well feel pressure to respond to police questioning in the hopes of securing release from detention or more favorable disposition of their pending charges, and this pressure may increase — not decrease — the longer the person is held. *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990). Yet, this prospect has not prevented courts, including our own, from applying the additional limitations test to persons held in pretrial status. Thus, the majority's broad reading of *Fields* is not only at odds with the *Cervantes* on-the-scene questioning rationale, but also calls into question the continuing validity of our decisions in *Ford* and *Pehowic*. In light of the completely different factual circumstances before the Court in *Fields*, the majority's implication that that case must dictate the outcome here is unwarranted.

## IV

Because what occurred here was nothing more than a single on-the-scene question about new suspicious conduct committed after the juvenile's arrest and detention, and because the circumstances clearly demonstrate that the juvenile was not subjected to any additional restrictions beyond those inherent in her incarcerated status, I would find that the trial court erred in granting the motion to suppress. I, therefore, respectfully dissent.